# No. 12,880.

## BALDAUF *v.* GUNSON.
(8 P. [2d] 265)

Decided February 1, 1932. Rehearing denied February 23, 1932.

Mr. WILLIAM DILLON, Mr. FRED S. CALDWELL, Mr. PHILIP HORNBEIN, Mr. J. M. TAYLOR, for plaintiff in error.

Mr. CHARLES R. ENOS, Mr. HAROLD H. HEALY, Mr. THEODORE A. CHISHOLM, Mr. JOEL E. STONE, for defendant in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

ACCORDING to the official returns, X. J. Baldauf, the Democratic candidate, was elected a county commissioner of Douglas county. Thomas R. Gunson, the Republican candidate, instituted a contest proceeding, and the court rendered judgment in his favor, whereupon Baldauf brought the case here on error.

The official returns showed 866 votes for Gunson and 868 for Baldauf. At the trial the court rejected 13 individual votes cast for Baldauf, and 32 individual votes cast for Gunson, with the result that Baldauf's plurality was increased by 19 votes. In Parker precinct No. 1 the vote, according to the official count, stood 150 for Baldauf and 67 for Gunson. The trial court rejected the official returns from that precinct, thereby giving Gunson a plurality. If the court's action in rejecting those returns was proper, Gunson was elected and the judgment should be affirmed; otherwise, Baldauf was elected and the judgment should be reversed.

1. Before reviewing the facts, it is well to state certain principles of law concerning the rejection of election returns. When it is clearly established that frauds subversive of the purity of the ballot box and tending to nullify the popular will have been perpetrated by the election officers of a precinct, or have been perpetrated by others with their knowledge, connivance and consent, and the extent of such frauds cannot be disclosed with reasonable certainty, the official returns from the

precinct should be thrown out. *Londoner v. People, ex rel. Barton,* 15 Colo. 557, 26 Pac. 135. So, also, they may be rejected where fraud and irregularities occur to such an extent that it is impossible to separate with reasonable certainty the legal votes from the illegal or spurious votes. *Vigil v. Garcia,* 36 Colo. 430, 87 Pac. 543. Even though no actual fraud be apparent, if the conduct of election officials amounts to such culpable negligence as to render their doings unworthy of credence and destroy the integrity of the returns, the returns from the precinct should be rejected. *Vigil v. Garcia, supra; People, ex rel. Graham v. Lindsey,* 80 Colo. 465, 253 Pac. 465. But the power to reject election returns should be exercised with great caution and only as a last resort. The presumption that election officers have faithfully discharged their duties always obtains until the contrary is shown. The fact that illegal ballots have been cast, or that other irregularities have taken place, does not ordinarily warrant the rejection of the entire poll. *Londoner v. People, ex rel. Barton, supra.* The illegal ballots should be rejected, but the lawful ballots may not be thrown out unless the misconduct has been so flagrant as to corrupt the entire vote in the precinct. *Hooper v. McNaughton,* 113 Kan. 405, 214 Pac. 613.

In *Weston v. Markgraf,* 328 Ill. 576, 580, 160 N. E. 215, the court said: "* * * the will of the people should not be defeated by an honest mistake of election officers, and * * * literal compliance with prescribed forms will not be required if the spirit of the law is not violated, and * * * form should be subservient to substance when no legal voter has been deprived of his vote and no injury of any kind has been done to anyone." And in *Findly v. Sorenson,* 35 Ariz. 265, 270, 276 Pac. 843, the following appears: "Of course, if the statute expressly provides that a failure to observe certain requirements invalidates the vote, the court can do nothing but enforce the law as it is, but, unless there is such a provision, or unless the error or irregularity goes to the honesty of the election

itself, it will be generally disregarded." The law is thus stated in McCrary on Elections (4th Ed.), §523: "The power to reject an entire poll is certainly a dangerous power, and * * * it should be exercised only in an extreme case, that is to say, a case where it is impossible to ascertain with reasonable certainty the true vote." And in a note on page 382 it is said: "Power to throw out the vote of an entire precinct should be exercised only under circumstances which demonstrate beyond reasonable doubt that there has been such disregard of law or such fraud that it is impossible to distinguish what votes were lawful and what were unlawful, or to arrive at any certain result whatever, or where the great body of voters have been prevented from exercising their rights by violence or intimidation," citing cases.

Such being the law, let us consider the facts disclosed by the record.

2. We will first consider the rejection of the entire returns from Parker precinct No. 1; for if we conclude that such action was erroneous, it will be unnecessary to discuss the trial court's rulings with reference to individual votes, as, whatever our decision would be with reference thereto, the result would not be changed. To justify the rejection of the returns, Gunson relies upon certain irregularities, including the failure of the election officials to comply with certain provisions of the statute concerning elections.

(a) It is said that there was no guard rail such as is required by section 7709, C. L. That section provides: "* * * a guard rail shall be so constructed and placed that only such persons as are inside such rail can approach within six feet of the ballot box and of such voting booths and compartments. The arrangement shall be such that the voting booth or compartment can only be reached by passing within such guard rail." Though there was no guard rail, there was a long bench some distance from the ballot box and so placed that the voting booths could be reached only by passing around the bench.

(b)   Section 7691, C. L., requires "counting judges and their clerks and watchers" to take an oath "that they will not in any manner make known to any one the result of the votes as they are being counted until the polls have closed." Arthur Crater, whose wife was one of the counting judges, testified that when he was in the polling place a counting judge or clerk—a woman, but not his wife—told him approximately how the vote for county commissioner stood. Mrs. Crater testified that she heard one of the counting judges, Mrs. Herzog, say to the latter's son, "Jimmy's ahead." Mr. Crater and another witness testified that they heard from people on the street that day approximately how Baldauf and Gunson were running—how the count stood.

(c)   The trial court found that Charles O'Brien, one of the Democratic receiving judges, "participated in the work of the counting judges, in the counting of the ballots." The finding is based upon testimony to the effect that there was a dispute among the counting judges as to the counting of a ballot; that O'Brien, who, Gunson claims, was the "dominating figure at the receiving judges' table," was called; and that he and one Cotner took part in the discussion. But there is nothing in the record to indicate that the counting judges did not settle the question for themselves and to the satisfaction of everybody; and Baldauf's counsel make the statement, unchallenged by counsel for Gunson, that the questioned ballot was counted for Gunson.

(d)   The counting judges and clerks together left the polling place for meals, one hour at noon and one hour in the evening, leaving the tally books and the "count" on the table, and leaving unlocked the box containing the counted ballots. The court found that the tally books and the "count" were thus exposed, subject to scrutiny and alteration by unauthorized persons, and that the ballot box was left without any lawfully authorized person being in charge thereof. But during the absence of the counting officers the receiving judges and clerks, both

Republicans and Democrats, remained on duty. They were within 25 feet of the counting officers' table and of the ballot box, which were within plain view. There is not a word of evidence, and there is no suggestion, that during the absence of the counting officers any person altered or scrutinized the tally books or the "count," or even approached the counting officers' table, or the box containing the counted ballots.

(e) The court found that Gus Deepe, the Democratic candidate for coroner, was permitted to "circulate within the poll room and within one hundred feet of the polling place, and to exhibit to electors waiting to vote, and who shortly thereafter did vote, sample ballots, and to converse with said voters in regard thereto, and to otherwise electioneer." The evidence relied upon to support this finding is the testimony of Mrs. Venita A. Gunson, who said that while she was in the room, Deepe took several sample ballots and went to Mr. and Mrs. Flierl, who had just entered the room, and said to them, pointing on the ballot, "Here is Baldauf."

(f) It is said that after the close of the poll unauthorized persons surrounded the table at which the counting judges and clerks were working, and, together with others in the room, created a "disturbance" sufficient to interfere with the count. According to the evidence, it appears that O'Brien and "quite a few" bystanders, who wanted to get the count, went up close to where the counting officers were working; that there was "considerable" noise and confusion; that "it was mostly the people in the back of the hall"; and that they were asked at least two times to be quiet, as it was difficult for the clerks to hear what the judges were calling. There is no claim that there was any riotous conduct, or that the noise was other than that caused by the voices of those who were discussing the election and speculating on the result. It is not contended, or even suggested, that because of the hum of voices the votes were not counted accurately.

Undoubtedly, there were some irregularities, including

a failure on the part of the election officers to strictly comply with the law. The officers should have seen to it that a guard rail was installed in the manner prescribed by the statute. The counting officers should not have divulged how the vote stood; indeed, the statute (C. L., §7691) makes such misconduct a misdemeanor, punishable by fine and imprisonment, or both, and by disfranchisement for five years. The counting officers should not have gone out of the room, leaving the tally books, the "count" and the unlocked box in the manner described. But these irregularities did not constitute fraud subversive of the purity of the ballot box and tending to nullify the popular will, or such culpable negligence as to render the doings of the election officials unworthy of credence and destroy the integrity of the returns; indeed, the irregularities were not inconsistent with honest mistake. They did not render it impossible to separate with reasonable certainty the legal votes from the illegal or spurious votes. The trial court experienced no difficulty in ascertaining the individual votes cast by those who were not qualified electors, or who were not registered, or who were given assistance without a compliance with the formalities prescribed by law. It does not appear that by reason of the irregularities any legal voter was deprived of his vote; nor does it appear that injury of any kind was done to anyone. The irregularities were not of sufficient gravity to warrant the rejection of the official returns from the precinct.

For the error of the trial court in rejecting the returns from Parker precinct No. 1, the judgment is reversed.

MR. JUSTICE CAMPBELL dissents.

MR. JUSTICE ALTER did not participate.