**CITY OF AURORA, Petitioner,**

v.

**Max ACOSTA, Josephine Pullano, James Roper and Larry Hoffenberg, Respondents.**

**No. 94SC250.**

Supreme Court of Colorado, En Banc.

Feb. 6, 1995.

Office of City Atty., Charles H. Richardson, Jr., Michael J. Hyman, Aurora, Becker Stowe Bowles & Lynch, P.C., Daniel C. Lynch, Denver, for petitioner.

Kilkenny Donelson & Gambin, A Partnership of Professional Corporations, Gregory J. Kilkenny, Stephen W. Donelson, Paul G. Gambin, Denver, for respondents.

Bruno, Bruno & Colin, P.C., Marc F. Colin, Richard A. Stubbs, Denver, for amicus curiae Aurora Police Ass'n.

David W. Broadwell, Denver, for amicus curiae Colo. Mun. League.

Justice MULLARKEY delivered the Opinion of the Court.

Respondents Acosta, Pullano, Roper and Hoffenberg, citizens and taxpayers of the City of Aurora, brought this action against the City of Aurora seeking invalidation of two voter-approved ballot issues, limitation of the district's spending base that was also approved by voters in a second ballot issue, declarative and injunctive relief regarding all future ballot questions, and an award of attorney's fees. Respondents claimed that the ballot issues in question violated Article X, Section 20 of the Colorado Constitution (Amendment 1) by (1) failing to state a proposed spending increase as a dollar amount, and (2) failing to include an estimate of the "full fiscal year dollar increase" of proposed property taxes. The district court disagreed and granted the City's motion for summary judgment on all of the issues presented and dismissed Acosta's complaint with prejudice. Acosta appealed to the court of appeals. The City then petitioned the Supreme Court for certiorari review before judgment pursuant to C.A.R. 50. The Supreme Court affirms the judgment of the district court and, applying a "substantial compliance" standard, holds that the ballot issues in question did not violate the requirements of Amendment 1.

Respondents Acosta, Pullano, Roper and Hoffenberg (Acosta), citizens and taxpayers of the City of Aurora, brought this action against the City of Aurora (the City) seeking invalidation of a voter-approved ballot issue; limitation of the district's spending base that was also approved by voters in a second ballot issue; declarative and injunctive relief regarding all future ballot questions; and an award of attorney's fees. Acosta claimed that the ballot issues in question violated Article X, Section 20 of the Colorado Constitution (Amendment 1). The district court disagreed and granted the City's motion for summary judgment on all of the issues presented and dismissed Acosta's complaint with prejudice. Acosta appealed to the court of appeals. The City then petitioned this court for certiorari review before judgment pursuant to C.A.R. 50. We granted certiorari and now affirm the judgment of the district court.

## I.

The City of Aurora submitted eight financial issues to the voters in a mail ballot election held on November 2, 1993. These issues included six bond questions, a sales and use tax increase, and a revenue change. The voters approved Ballot Question A and Ballot Question G. Ballot Question A (Question A) sought an increase in the sales and use tax rate for the purpose of providing more police protection and more criminal detention space. Ballot Question G (Question G) sought an amendment of the Aurora Charter to allow the City Council to issue general obligation bonds to finance public safety projects "including fire station improvements, an emergency operations center and the completion of a detention center." Question G also requested voter approval of additional property taxes "imposed in each year without limit of rate or amount" as necessary to pay such bonds, and a property tax increase of not more than $2,000 annually to pay for operation and maintenance of the new facilities.

Prior to the election, Acosta filed a complaint attempting to invalidate the proposed ballot questions as violating Amendment 1. Acosta argued that (1) any violations of Amendment 1 must be subject to strict scrutiny; (2) violations of Amendment 1 must be determined under a standard of strict compliance; and (3) plaintiffs were not required to demonstrate that violations affected the election results in order to have standing to sue. Acosta alleged that the City violated Amendment 1 in Questions A through G by (1) combining debt and spending issues in the same ballot question; (2) attempting to exempt further tax increases from Amendment 1 election requirements; (3) failing to include the dollar amounts of tax and revenue increases in the ballot titles; and (4) failing to capitalize ballot titles.

The trial court held that these challenges were moot except with respect to the two ballot issues approved by the voters, Questions A and G. It then granted summary judgment for the City on Acosta's remaining challenges to Questions A and G.

We granted certiorari to review all of the questions raised in the City's petition.[1] Subsequent to our decision to grant certiorari, we decided *Bickel v. City of Boulder*, 885 P.2d 215 (Colo.1994). The parties agree that our opinion in *Bickel* resolves most of the issues on which we initially granted certiorari in this case. The following issues alone remain for resolution:

1. Whether Ballot Question A violated Amendment 1 by failing to include a dollar amount for proposed spending increases?

2. Whether Ballot Question G violated Amendment 1 by failing to include the

---

1. We granted certiorari to review the following issues:
 1. Did the trial court correctly conclude that:
 a. the procedural rules applicable to the election were directory, rather than mandatory, or, in the alternative, that
 b. even if such rules were mandatory, respondents were required to show that the formal and procedural defects complained of affected the result in order to invalidate the election under Article X, Section 20 of the Colorado Constitution to the November 2, 1993, election?
 2. Was the trial court correct in interpreting Amendment 1 in a manner harmonizing it with existing law? In particular, was the trial court correct in concluding that:
 a. the text of Ballot Question A, which authorized an increase in the rate of the City's sales and use tax and the expenditure of all of the resulting revenues, was sufficient under such Constitutional provision,
 b. it was permissible for the City to request the authority to borrow money and the authority to levy taxes to repay the borrowing in the same question (Question G) submitted to voters, and
 c. general obligation bonds are still available to the City under the Constitution and the City's home rule charter as a method of financing?
 3. Was the City required under Amendment 1 to include in the election notice the ministerial acts, orders or directions of the City Council calling the elections?
 4. Does Amendment 1 make the capitalization of ballot titles in the notice of election a prerequisite to a valid election?
 5. Did Amendment 1 require, as a prerequisite to a valid election, that the City publish comments filed with the County Clerk of Arapahoe County, Colorado, but not with the City?
 6. Did the trial court err in concluding that the use of an explanatory footnote in the portion of the notice of election describing the City's existing debt was not a violation of Amendment 1?

language necessary for measures seeking a tax increase under section 3?

Because we find that both Question A and Question G complied with the requirements of Amendment 1, we uphold the judgment of the district court.

## II.

■ The first step in reviewing any alleged violation of the state constitution is to look at the terms of the constitutional provision itself and to apply the constitutional provision according to its clear terms. *Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization,* 761 P.2d 197, 202 (Colo.1988). We must give effect, if possible, to every word, *Charlton v. Kimata,* 815 P.2d 946, 949 (Colo.1991), and consider "the object to be accomplished and the mischief to be avoided" by the provision at issue. *People v. Y.D.M.,* 197 Colo. 403, 407, 593 P.2d 1356, 1359 (1979). In addition to these general interpretational rules, Amendment 1 provides that "[i]ts preferred interpretation shall reasonably restrain most the growth of government." Colo. Const. art. X, § 20(1). We have interpreted this language to mean that "where multiple interpretations of an Amendment 1 provision are equally supported by the text of that amendment, a court should choose that interpretation which it concludes would create the greatest restraint on the growth of government." *Bickel,* 885 P.2d at 229.

■ When reviewing claims brought to enforce the Amendment 1 election provisions, we have held that a "substantial compliance" standard is the proper measure to apply. *Id.* at 227. The application of this standard reflects our long-standing position that "[i]mposing a requirement of strict compliance with voting regulation, especially in the absence of any showing of fraud or other inten-

tional wrongdoing, would unduly restrict the franchise." *Id.* at 226–27; *see also Meyer v. Lamm,* 846 P.2d 862, 875–78 (Colo.1993); *Erickson v. Blair,* 670 P.2d 749, 754–55 (Colo. 1983); *Felzien v. School Dist. RE–3 Frenchman,* 152 Colo. 92, 96, 380 P.2d 572, 574 (1963); *Baldauf v. Gunson,* 90 Colo. 243, 245–46, 8 P.2d 265, 266 (1932); *Burbank v. Board of County Comm'rs,* 70 Colo. 302, 306–07, 201 P. 43, 44–45 (1921). We will address the violations of Amendment 1 alleged by Acosta in light of these standards.

### A.

■ Ballot Question A stated:
Shall Aurora's taxes be increased by $5,000,000 annually, commencing in 1994, for more police protection and more detention space, and *by whatever additional amounts are raised annually thereafter,* from a .25% Sales and Use Tax, *to be spent as a voter-approved revenue change and an exception to the limits which would otherwise apply,* to permit: 1) increased staffing of the Aurora Police Department, including civilian support staff and necessary facilities and equipment to provide a minimum of two uniformed police officers per 1000 person population in 1995 and thereafter; and 2) operation and maintenance of the municipal detention facility, without limiting or affecting the collection or spending of other revenues?

(emphasis added). Acosta contends that Ballot Question A violated Amendment 1 by seeking approval of an "open-ended" revenue increase. In particular, Acosta argues that the phrase in section 7(d), "voter-approved revenue changes are *dollar amounts,*" implies that voter approval cannot be valid unless the ballot question states the proposed revenue increase in dollars, rather than in terms of the source of revenue. Colo. Const. art X, § 20(7)(d) (emphasis added).[2] Ques-

---

2. To place the phrase on which Acosta relies in context, we set forth section 7(d) in full and highlight that phrase:

> If revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset. Initial district bases are current fiscal year spending

and 1991 property tax collected in 1992. Qualification or disqualification as an enterprise shall change district bases and future year limits. Future creation of district bonded debt shall increase, and retiring or refinancing district bonded debt shall lower, fiscal year spending and property tax revenue by the annual debt service so funded. Debt service changes, reductions, (1) and (3)(c) refunds, and

tion A is thus invalid, according to Acosta, because it proposed retention of any excess revenue that might result from collection of the new sales and use tax without providing to voters the specific dollar amount of the excess revenue it sought to retain. We do not agree.

Amendment 1 requires voter approval for tax increases and limits spending increases unless approved by the electorate.[3] Revenue "collected, kept, or spent illegally" must be refunded with interest. *Id.* § 20(1).

We interpret Amendment 1 to require voters to approve the collection, retention or expenditure of revenue increases in three situations. The first is where a district proposes any of the forms of revenue *increases* detailed in section 4(a), such as new taxes, increased tax rates or tax policy changes that result in increased tax revenues. *Id.* § 20(4)(a). The second is where revenues actually collected exceed the dollar amounts of the spending limits imposed in section 7(b). In this situation, voters may "approve a revenue change as an offset" to the excess revenues. *Id.* § 20(7)(d). The third circumstance in which voters must approve a revenue change is where the revenues generated by a specific tax increase exceed the estimated maximum dollar amount included in the election notice and ballot title under which voters approved the tax increase. In this situation, the district must refund the excess

revenues and decrease the tax rate in proportion to the excess revenues collected, "except by later voter approval." *Id.* § 20(3)(c). The case now before us comes within the third category. In Question A, the City attempted to obtain voter approval to retain any excess future revenues which may be collected from the proposed .25% increase in the City's sales and use tax.

No provision of Amendment 1 explicitly requires proposed revenue changes in this third category to be presented for voter approval as a dollar amount. Section 3 of Amendment 1 is entitled "Election provisions" and addresses the requirements for form and content of ballot titles and election notices. This section requires that proposed revenue changes be presented in dollar amounts only when voters are asked to approve a ."district tax increase." *Id.* § 20(3)(b)(iii). In that situation, the estimated maximum dollar amount of the increase must be provided in the ballot title and notice. *Id.* § 20(3)(b)(iii), (c). Amendment 1 contains no other provision indicating the form in which proposed revenue changes are to be presented to the voters for approval. Nor is there any provision prohibiting a taxing district from presenting a revenue change to the voters by reference to the tax rate. The challenged revenue change in Ballot Question A was not a district tax increase

---

*voter-approved revenue changes are dollar amounts* that are exceptions to, not part of, any district base. Voter-approved revenue changes do not require a tax rate change. *Id.* § 20(7)(d) (emphasis added).

**3.** Specifically, Amendment 1 requires voter approval in advance for:

any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district.

*Id.* § 20(4)(a). It sets a local district's maximum annual spending increase over the district's "base" at an amount equal to the rate of inflation plus the percentage change in state population in the prior calendar year, "adjusted for revenue changes approved by voters after 1991." *Id.* § 20(7)(b). The district base is the current fiscal year spending and 1991 property tax revenues. *Id.* § 20(7)(d). "Fiscal year spending" means "all district expenditures and reserve increases

except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards, or property sales." *Id.* § 20(2)(e). "Debt service changes, reductions ... and voter-approved revenue changes are dollar amounts that are exceptions to, and not part of, any district base." *Id.* § 20(7)(d).

When the revenues collected "from sources not excluded from fiscal year spending" exceed the dollar amount of these limits, Amendment 1 requires the district to refund the excess "unless voters approve a revenue change as an offset." *Id.* Amendment 1 also requires that if a tax increase or fiscal year spending (including the *revenue from the tax increase*) exceeds the maximum amounts estimated in the election notice for the ballot issue in which the increase was approved, the excess must be refunded, "except by later voter approval." *Id.* § 20(3)(b)(iii), (c). These "[v]oter approved revenue changes do not require a tax rate change." *Id.* § 20(7)(d).

subject to subsection 3(b)(iii) or (c) and thus, no provision of Amendment 1 expressly required the City to present the proposed increase as a dollar amount.

Since Amendment 1 imposes no express requirement that the ballot title present this type of revenue change as a dollar amount, we next consider Acosta's contention that such a requirement is implicit in the phrase "voter-approved revenue changes are dollar amounts." *Id.* § 20(7)(d). Section 7 is entitled "Spending limits" and subsection 7(d), where this language appears, is primarily devoted to the method for calculating a district spending base. *See supra* note 2. As discussed earlier, new taxes are a type of revenue change requiring voter approval. Taxes, *e.g.,* sales and use taxes, often are expressed in terms of tax rates, not dollar amounts. Thus, the language in section 7(d) is necessary because voter-approved revenue changes must be converted to dollars if the spending limit figure is to be adjusted by the amount of the voter-approved change as required by sections 7(b). This provision, therefore, has a specialized purpose and cannot be interpreted as generally applicable to mandate that revenue changes proposed in a ballot issue be stated in dollar amounts.

If Amendment 1 had been intended to require that all revenue changes be presented to the voters for approval in terms of dollar amounts, it could have been drafted to state precisely that. In the absence of a provision of Amendment 1 that expressly requires the City to present this type of proposed revenue change as a dollar amount, we hold that Question A complied with the requirements of Amendment 1.

### B.

 Acosta challenges Ballot Question G on grounds that the ballot title failed to include an estimate of the "full fiscal year dollar increase" of proposed property taxes. Instead, the City sought approval for "such additional property taxes imposed in each year without limit of rate or amount, as necessary to pay such bonds or other refundings thereof." Although the dollar amount of the proposed taxes was supplied in the election notice accompanying the ballot, Acosta argues that providing this information in the election notice is not sufficient either to comply, or to substantially comply, with the terms of Amendment 1. We do not agree that, under the circumstances of this case, providing this information in the election notice was inadequate to achieve substantial compliance with the requirements of Amendment 1.

Amendment 1 requires that "[b]allot titles for tax ... increases shall begin, 'SHALL (DISTRICT) TAXES BE INCREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY ...?'" Colo. Const. art. X, § 20(3)(c). The ballot title for Question G stated:

> Shall Aurora's debt be increased not to exceed $4,855,000 with a repayment cost not to exceed $7,510,000 (Principal and Interest), for the protection and safety of residents throughout the City by providing public safety projects, including fire station improvement, an emergency operations center, and the completion of a detention center, by the amendment of Section 11–19 of the Aurora Charter to permit the issuance by the City Council, without any further approval, of General Obligation Bonds, *to be paid from such additional property taxes, imposed in each year without limit of rate or amount, as are necessary to pay such bonds or any refundings thereof,* the proceeds of which bonds, including investment earnings, shall be spent to acquire, construct, install, equip, and repair such projects, together with necessary incidentals, and shall Aurora's property taxes be increased not to exceed $2,000 annually for the continuing operation and maintenance of such projects, without in any other way affecting Aurora's other debt, taxes, revenues, or expenditures?

(emphasis added).

Clearly, the text of the ballot title of Question G did not include an estimate of the full fiscal year dollar increase in additional property taxes that would be necessary to repay the general obligation bonds. Consequently, Question G did not strictly comply with Amendment 1 requirements. The remaining question before us is whether the language of

Question G substantially complied with the provisions of section 3(c). We find that it did.

In *Bickel*, we identified some of the factors that a court should consider in determining whether a taxing district achieved substantial compliance with the election requirements of Amendment 1. These factors include:

(1) the extent of the district's noncompliance with respect to the challenged ballot issue, that is, a court should distinguish between isolated examples of district oversight and what is more properly viewed as systemic disregard of Amendment 1 requirements, (2) the purpose of the provision violated and whether that purpose is substantially achieved despite the district's noncompliance, and (3) whether it can reasonably be inferred that the district made a good faith effort to comply or whether the district's noncompliance is more properly viewed as the product of an intent to mislead the electorate.

*Bickel*, 885 P.2d at 227.

*Bickel* addressed a situation substantially similar to this one. In *Bickel*, the City of Boulder failed to include an estimated dollar amount of a property tax increase in a ballot title. The tax secured the proposed debt in the event that the primary source of revenue, earmarked sales and use tax revenue, was insufficient. In that case, we considered the factors listed above and found that the district had not substantially complied with the section 3(c) requirement.

We found the second factor to be dispositive and struck down the contingent property tax. We held that:

To create an exemption from the requirements of section 3(c) anytime a district has difficulties estimating its proposed tax increases would undermine the primary purpose of Amendment 1's disclosure provisions: that is, to provide the electorate with the information necessary to make an intelligent decision on ballot issues involving debt and/or tax increases.

*Id.* at 236.

As in *Bickel*, the first and third factors for consideration support a finding of substantial compliance in this case. The City's omission does not indicate systemic disregard for the requirements of Amendment 1, nor is there evidence of bad faith or an attempt to mislead the electorate on the part of the City in neglecting to include the dollar amount of the tax increase in the ballot title of Question G. The City included this information in the election notice that accompanied the ballot.

Furthermore, like *Bickel*, the dispositive consideration is whether the purpose of the disclosure provision is substantially achieved despite the district's literal noncompliance. However, in this case, consideration of this second factor does not compel the same conclusion that it did in *Bickel*.

The omission of the maximum dollar amount of the proposed tax increase in the instant case occurred on the ballot in a mail ballot election rather than a regular election. Voters were not required to vote in a public polling place, but voted in their own homes and either mailed or dropped off their ballots at prescribed locations. Each registered voter received both a ballot and a notice of election at the voter's mailing address. The notice of election was clearly labeled "Important Voter Information"; it complied with the content requirements of Amendment 1; and it arrived well in advance of the election.[4] Voters thus had the ability to vote at their leisure, in their own homes, with all of the information mandated by Amendment 1 concerning the ballot issues for reference at their fingertips. This information concerning Question G in the election notice specifically stated, "[t]he maximum dollar amount of the proposed property tax increase associated with the bonds for the first full fiscal year that the increase is in effect is as follows: taxes for Repayment of bonds—$512,000; taxes for Operation and Maintenance of such Projects—$2,000." Under these circumstances, we find that the purposes of the

---

4. Under § 3(b), districts must mail election notices 15–25 days before a ballot issue election.

Colo. Const. art. 20, § 3(b).

ballot disclosure provisions were not undermined by the City's omission. Accordingly, we hold that Question G substantially complied with the election requirements of Amendment 1.

### III.

For the foregoing reasons, we hold that Ballot Questions A and G complied with the election provisions of Amendment 1 and we affirm the judgment of the trial court.

SCOTT, J., did not participate.