QUESTIONS PRESENTED AND CONCLUSIONS
Whether designated enterprises which provide internal services to the University qualify as enterprises under TABOR; and if so, whether revenues resulting from the provision of such internal services may be pledged in repayment of revenue bonds issued on behalf of such enterprises.
Yes. A designated enterprise may be a government-owned business qualifying as an enterprise under TABOR, even if it provides services both to the University and to external customers, so long as the enterprise is financially distinct from the University and the transaction between the enterprise and the University bears all the indicia of a commercial, market exchange. Furthermore, revenues received from such transactions may be pledged to the payment of debt service requirements on revenue bonds issued on behalf of such enterprises without violating Article XI, Section 3 of the Colorado Constitution.
BACKGROUND
TABOR was proposed by initiative and was approved by the voters in the general election on November 3, 1992. This multi-faceted provision requires voter approval for certain tax increases and the incurring of multiple fiscal year debts or financial obligations, limits the growth of revenues, and limits spending. See Submission of Interrogatories onSenate Bill 93-74, 852 P.2d 1 (Colo. 1993). It is included in Article X of the Colorado Constitution, which deals with revenue.
Exempted from these restrictions are "enterprises", which TABOR defines as follows:
 "Enterprise" means a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined.
Colo. Const. Art. 10, § 20(2)(d). To effectuate this constitutional exemption, in 1994 the General Assembly enacted House Bill 93-1355 (codified at section 23-5-101.5, (C.R.S. 1994 Supp.)). H.B. 93-1355 sets out procedures whereby institutions of higher education could designate certain auxiliary facilities as enterprises for a one year period. Unless the expiration of such enterprise designation is postponed by an act of the General Assembly the enterprise terminates after a year. The statute also provides for review of such designations by the Office of the State Auditor, which submits its findings to the Legislative Audit Committee for appropriate action.
Pursuant to this statute, the University of Colorado designated four enterprises with revenues of approximately $167 million in Fiscal Year 1993 and $184 million in Fiscal Year 1994. These designations are Auxiliary Facilities, Education Services, Research Support Services, and Other Self-Funded Services. Pursuant to section 23-5-101.5(3)(a), C.R.S. (1994 Supp.), the General Assembly postponed expiration of these enterprise designations until June 30, 1999 through enactment of Senate Bill 94-015 (codified at section 23-5-101.5(4), C.R.S. (1994 Supp.)). The Other Self-Funded Services enterprise includes the telecommunications system, cogeneration facilities, and insurance operations. The Research Support Services enterprise includes the animal resource center. These enterprise operations provide products and services for a fee, both to the University itself, and to other customers external to the University.
From the University's standpoint, these enterprise designations are desirable because they allow the University to issue revenue bonds on behalf of the enterprises on favorable credit terms with debt service limited to repayment from a designated enterprise fund. Currently, both the telecommunications system and cogeneration facilities are funded through certificates of participation ("COP's"). Refinancing these COP's with revenue bonds would save the University approximately $400,000. Absent an enterprise designation, the University would be prohibited from issuing bonds to be repaid from state appropriated monies absent voter approval.
Between January and March of 1995, the Office of the State Auditor, pursuant to section 23-5-101.5(3)(b), C.R.S. (1994 Supp.), conducted an audit to review the enterprise designations of higher education institutions. During this process, the Auditor raised concerns regarding whether these enterprises were in fact a subterfuge to allow state appropriated monies to be used to repay revenue bonds, thus frustrating the intent of TABOR. Consequently, the Auditor concluded that the above-referenced operations did not constitute "government-owned businesses" for purposes of TABOR because they provide services both to the institution and to external customers and rely on revenues from both sources to be self-sustaining. In other words, the Auditor concluded that, in order to be considered a "government-owned business", a designated enterprise must be self-sustaining and economically viable based primarily on revenue received in market exchanges for a product or service provided to customers external to the University.
A related question also arose regarding whether such enterprises may pledge revenues received from services provided to the institution for repayment of revenue bonds issued on behalf of the enterprise, without violating the Debt Limitation Provision of the Colorado Constitution.
ANALYSIS
 COMPLIANCE WITH TABOR
The issue at hand turns upon what constitutes a "government-owned business" for purposes of the definition of "enterprise" in TABOR. Various key terms used in the definition of "enterprise", including the term "government-owned business", are not themselves defined in TABOR.
In interpreting the state constitution, we rely upon general rules of statutory construction. Bickel v. City ofBoulder, 885 P.2d 215, 228 (Colo. 1994). We must consider the terms of the constitutional provision itself and apply the constitutional provision according to its clear terms. Cityof Aurora v. Acosta, 892 P.2d 264, 267 (Colo. 1995). In addition to these general rules of interpretation, TABOR provides that "[i]ts preferred interpretation shall reasonably restrain most the growth of government". Colo. Const. art. X, § 20(1). The Colorado Supreme Court has interpreted this language to mean that "where multiple interpretations of an Amendment 1 [TABOR] provision are equally supported by the text of the amendment, a court should choose that interpretation which it concludes would create the greatest restraint on the growth of government."Acosta, 892 P.2d at 267.
The designated enterprises at issue here (telecommunications center, cogeneration facilities, insurance operations and animal resource center) clearly appear to qualify as being "government-owned". The Colorado Supreme Court recently held that "[t]he term `government-owned,' as its plain language implies, is commonly used to indicate ownership by a governmental entity".Nicholl v. E-470 Public Highway Authority, 896 P.2d 859,868 (Colo. 1995). The Board of Regents has responsibility under Article VIII, Section 5 of the Colorado Constitution for the general supervision of the University and the exclusive control and direction of its funds and appropriations.See also section 23-20-112, C.R.S. (1988). The Regents possess authority over the disposition of property of the University, section 23-20-121, C.R.S. (1988), as well as authority to promulgate rules and regulations necessary for the governance of the University and its property. Section 23-20-112, C.R.S. (1988). Consequently, the designated enterprises seem clearly to be "owned" by the University for purposes of Colo. Const. art. X, § 20(2)(d).
The next inquiry regards whether the designated enterprises at issue here constitute "businesses". The Office of the State Auditor has opined that in order to meet the constitutional definition of "business", the designated enterprise must be self sustaining and economically viable based upon revenue received in market exchanges for a product or service provided to customersexternal to the organization. In other words, those activities that are internal service operations that predominately provide services for a fee to the University itself, rather than to students or other external customers, cannot be considered "businesses", and thus are excluded from enterprise designation under TABOR. Although the Auditor's concern for potential misuse of enterprise designations is a serious one, TABOR does not mandate the State Auditor's restrictive interpretation of the term "business".
TABOR is silent on the definition of the term "business". However, the Colorado Supreme Court recently interpreted this term as used in TABOR in the following manner:
 The term `business' is generally understood to mean an activity which is conducted in the pursuit of benefit, gain or livelihood. See Lindner Packing Provision Co. v. Industrial Comm'n, 99 Colo. 143, 147, 60 P.2d 924, 926 (1936) (occupation for livelihood or profit, activity, energy, capacity, that which busies or occupies the time, attention or labor of one, everything about which a person can be employed).
Nicholl, 896 P.2d at 868. In Nicholl, the Supreme Court found that in providing access to a public roadway in exchange for the payment of tolls and user fees, the E-470 Public Highway Authority was engaging in an activity conducted in the pursuit of benefit, gain or livelihood and thus fit the definition of a "business". Id.[1]
It is instructive to note that in reaching this conclusion, the Court in Nicholl expressly rejected the argument that in order to qualify as an enterprise, the activities of the entity in question must not be "essentially governmental in nature", finding that this interpretation "is not supported by the text of the amendment . . ." Id. at 869, ft. 9. Thus, the Nicholl Court focused its analysis on the object of the activity carried on by an entity — i.e., an activity engaged in for the purpose of gain and profit; and not on such factors as the identity or nature of the customers of the entity, or the governmental nature of the activities.See also City and County of Denver v. Gushurst,120 Colo. 465, 210 P.2d 616, 619 (1949) ("business" constitutes an operation for "gain or profit"); Fine v.Barry and Enright Productions, 731 F.2d 1394 (9th Cir. 1984) ("business" constitutes activity "for the purpose of . . . pecuniary reward").
Applying this case law to the present matter, we conclude that the term "business" as used in TABOR refers not solely to the identity of the customer, but also to the nature of the entity, the type of activity engaged in, and to whether the economic transactions involved of the sort clearly undertaken for the purpose of gain or profit within the private sector.
Specifically, to meet the "business" requirement, such an enterprise must be an independent, self-supporting government-owned business[2] that receives income, fees, and revenue in return for the provision of goods and services. The very concept of an enterprise under TABOR envisions an entity that is owned by the government institution, but is financially distinct from it. The financial affairs of the enterprise must be those of a self-supporting business-like activity that provides goods and services for a fee.
Second, to be considered a "business" the enterprise must engage in the kind of activity that is commonly carried on for profit outside the government. In this respect, the activities engaged in between the enterprise and the University must bear the indicia of arms-length, market exchanges and goods and services must be provided at a market-rate sufficient for the independent operation of the enterprise.
Thus, an enterprise could provide its services to the University so long as the enterprise is operated as a self-supporting business activity and the transactions between the enterprise and the University are market exchanges taking place in a competitive, arms-length manner. This requirement is necessary to eliminate the concern that such a transaction is merely a subterfuge designed to circumvent the debt limitation provisions of TABOR. Moreover, where an enterprise is also providing market driven services to the public, as here, there is a greater likelihood that the enterprise meets TABOR restrictions. This is both a legal and fact-based assessment.
We take no position at this time on whether the designated enterprises at CU meet these criteria. This would be a fact-based assessment based on the structure of the enterprises and an analysis of the activities carried on by the enterprise. However, we do note that some of these attributes do appear to characterize the designated enterprises at the University of Colorado. The services provided through the operation of the University's enterprises are clearly of the type that are available through the private sector — telecommunications, utilities, insurance and other services. The telecommunications enterprise sells its services to individual campus departments, research facilities, and students; all of whom are free to choose a different service should they wish to do so. The cogeneration facility charges the market rate for power, and sells much of its power to the Public Service Company.
The designated enterprises are operated based upon a financial analysis of expenditures and revenues very much like a privately-owned business. In addition, to the extent that services are provided to the designated enterprises by the University, those costs are charged to and paid by the enterprise to the University, and services provided to the University by the enterprise are charged to and paid by the University to the enterprise. The definition of "business" provided by theNicholl Court seems to support the conclusion that the University's enterprises qualify as "businesses" for purposes of TABOR.
This interpretation is also supported by the clear wording of section 23-5-101.5, C.R.S. (1994 Supp.). Under TABOR, an enterprise, in addition to meeting the definition of "government-owned business", must receive under 10% of its annual revenues in grants from all Colorado state and local governments combined. Colo. Const. art. X, § 20(2)(d). The term "grant" is not defined by TABOR. For the purposes of clarifying the requirements that must be met for an auxiliary facility to qualify as an enterprise, the statute specifically excludes from the definition of "grant" the following categories of funds:
 (A) any indirect benefit conferred upon an auxiliary facility from the state or any local government in Colorado;
 (B) any revenues resulting from rates, fees assessments, or other charges imposed by an auxiliary facility for the provision of goods or services by such auxiliary facility, including fees paid to the auxiliary facility for internal services provided to the institution of higher education with which the auxiliary facility is associated;
Section 23-5-101.5(2)(b)(II), C.R.S. (1994 Supp.) (emphasis added). Therefore, any amounts paid to an auxiliary facility by the internal departments or components of the University, if paid in return for goods and services provided by such auxiliary facility, do not constitute grants for purposes of qualification of such auxiliary facility as an enterprise. Thus, this section makes it clear that such payments for internal services do not constitute governmental grants, but rather payments for services.[3]
In interpreting statutes the primary task is to give effect to the legislature's intent, and that intent is to be discerned from the plain meaning of the statutory language. Kane v.Town of Estes Park, 786 P.2d 412 (Colo. 1990). Furthermore, a legislative act is presumed to be constitutional and the party challenging an act bears the burden of proving beyond a reasonable doubt that the act is unconstitutional.Firelock, Inc. v. District Court, 776 P.2d 1090
(Colo. 1989). As discussed above, the legislature's interpretation of TABOR in section 23-5-101.5, C.R.S. (1995 Supp.) indeed passes the "reasonable doubt" test. Consequently, we conclude that an auxiliary facility at the University of Colorado may qualify as an enterprise under TABOR, if the enterprise is operated as an independent, self supporting entity that operates as a business and provides services to the University and to external customers in a market exchange, and relies upon revenue from both sources in order to be self-sustaining.
This interpretation is fully consistent with the stated intention of TABOR to "reasonably restrain most the growth of government." Since the provisions of TABOR focus primarily on establishing limits on "district" revenues, spending, and incurrence of debt, the provision's reference to restraining the growth of government seems to apply to restraining the growth of "districts". Under TABOR, an "enterprise" is not a district. Indeed, no provision of TABOR appears intended to restrain the growth of enterprises. This exemption for enterprises appears to be an invitation to restrain the growth of districts through appropriate "decentralization" of those portions of governmental entities capable of being qualified as enterprises.
DEBT LIMITATION
The issue still remains whether revenues received from the provision of goods and services by an auxiliary facility enterprise approved pursuant to section 23-5-101.5, C.R.S. (1994 Supp.) may be pledged to the payment of debt service requirements on revenue bonds issued on behalf of such enterprises without violating Article XI, Section 3 of the Colorado Constitution, ("Debt Limitation Provision"), even though such revenues are generated in part by payments received for services provided to the University and paid for with appropriated funds.
For over 100 years prior to the passage of TABOR, the state constitution has been consistently interpreted as prohibiting the state from incurring a general obligation debt.
The State shall not contract any debt by loan in any form . . . .
Colo. Const. art. XI, § 3. One of the strongest statements of the policy underlying this prohibition on incurring debt appears in the case of In re Senate Resolution No. 2, 94 Colo. 101,31 P.2d 325 (1933):
 The purpose of the people in adopting the section involved is clear, i.e. to keep the state substantially on a cash basis, to prohibit the pledge of future fixed revenues, to forbid the contracting of debts which must be paid therefrom, and to make certain that one General Assembly shall not paralyze the next by devouring the available resources of both.
31 P.2d at 332.
Some indications of a debt prohibited by the Debt Limitation Provision have been described as follows:
 that the obligation pledged revenues of future years, that it requires use of revenues from a tax otherwise available for general purposes, that it is a legally enforceable obligation against the state in future years, or that the appropriation by future legislatures of monies in payment of the obligation is nondiscretionary.
Glennon Heights, Inc. v. Central Bank Trust, 658 P.2d 872,878-79 (Colo. 1983). In this context, the court has upheld certain government obligations as not constituting debt for the purposes of the Debt Limitation Provision, including a project which produces all of the revenue necessary to discharge the revenue bonds issued to create the project, without recourse to the general revenues of the public body. Lewis v.State Bd. of Agriculture, 138 Colo. 540, 335 P.2d 546
(1959); City of Trinidad v. Haxby, 136 Colo. 168,315 P.2d 204 (1957). Key to this exception is the absence of any legally enforceable obligation which would commit future revenues that are otherwise available for general purposes.See In re Interrogatories, 193 Colo. 298,304, 566 P.2d 350, 355 (1977).[4]
Section 23-5-102, C.R.S. (1994 Supp.) addresses funding for auxiliary facilities, including designated enterprises, and loans and bonds associated with them. Section 23-5-102(2) allows the governing board of any institution of higher education to issue revenue bonds on behalf of any designated enterprise, to obtain funds for constructing, acquiring, equipping, or operating the enterprise. Any bonds issued pursuant to this provision must be payable only from revenues generated by the designated enterprise. However, revenue generated by a designated enterprise that is associated with the University of Colorado may be pledged for the repayment of bonds issued by another designated enterprise which is not part of the same enterprise. Any issuance of bonds must be in conformance with section23-5-103.
Section 23-5-103, C.R.S. (1994 Supp.) authorizes CU to enter into contracts for the advancement of moneys and to pledge the net income from auxiliary facilities as security for the repayment of the moneys advanced. The statute further provides that if the advancement of moneys is on behalf of an enterprise, the Board of Regents is authorized to pledge only the net income, including fees and revenues, from the enterprise. It is clear that the statute does not delineate between the sources of the revenue (i.e., whether the revenue source is external or internal to the University). Moreover, as held in Lewis v. StateBoard of Agriculture, 138 Colo. 540, 335 P.2d 546 (Colo. 1959), this statute is presumed constitutional.
The pledging of net income, fees, and revenues derived from designated enterprises to the repayment of revenue bonds does not violate the Debt Limitation Provision. The revenue bonds are not payable out of or secured by any tax or appropriation but rather are payable from the net income, fees and revenue of the designated enterprise. A pledge of net income, revenue and fees from such sources does not in any manner obligate the state to make payments or to appropriate funds. The bondholders would have no right or remedy against the state and would not be able to obligate the state to appropriate funds[5]. Such a pledge does not contravene the provisions of the Debt Limitation Provision.
Section 23-5-101.5 further supports this conclusion. This statute emphasizes that a designated enterprise is evaluated as a self-supporting government-owned business that receives income, fees, and revenue in return for the provision of goods and services. The very concept of an enterprise under TABOR envisions an entity that is owned by the government institution, but is financially distinct from it. Indeed, no enterprise could exist unless the activities and financial affairs of the enterprise were viewed as distinct from other activities of the University. Therefore, if the enterprise concept under TABOR is to be afforded any significance at all, appropriations to the governmental body cannot be treated as appropriations to the enterprise. The financial affairs of the enterprise must be viewed as those of a self-supporting business activity that provides goods and services for a fee.
The definition of the term "grant" in section23-5-101.5(2)(b)(II)(B), C.R.S. (1994 Supp.) demonstrates a clear legislative intent that, for purposes of pledging revenues to secure revenue bonds, payments for goods and services by the University should be treated no differently than payments received from unrelated third parties. The revenues of the enterprise are treated as distinct financial resources that are available to pledge to the repayment of revenue bonds issued under the Auxiliary Facilities Statute. The test under the statute is not whether the funds were appropriated by the state at some earlier point but instead whether the revenues are derived from the operation of the enterprise. If viewed in the context of the decisions of the Colorado Supreme Court inLewis and other cases, the indirect application of moneys in payment of services, even if such moneys were appropriated by the state at some earlier point, does not constitute the creation of a debt by the state and is not prohibited under the Debt Limitation Provision.
SUMMARY
Based on the above analysis, it is our conclusion that an auxiliary facility at the University of Colorado may be a government-owned business qualifying as an enterprise under TABOR, even if it provides services both to the University and to external customers on a fee for service basis, and relies on the revenues from both sources in order to be self sustaining. However, the enterprise must be a self-supporting business activity engaged in the kind of activity that is carried on for profit outside the government, and the transaction between the enterprise and the University must bear the indicia of an arms-length, market exchange undertaken for the purpose of pecuniary gain. It is our further conclusion that revenues received from the provision of goods and services by an enterprise approved pursuant to section 23-5-101.5, C.R.S. (1994 Supp.) may be pledged to the payment of debt service requirements on revenue bonds issued on behalf of such enterprises without violating Article XI, Section 3 of the Colorado Constitution, even though such revenues are generated in part by funds received by the enterprise from the University for services provided to the University.
Sincerely,
 GALE A. NORTON Attorney General
 ANTHONY B. DYL First Attorney General
AMENDMENT ONE EDUCATION, HIGHER REVENUE BONDS
Section 23-5-101.5, C.R.S. Colo. Const. art. X, § 20.
HIGHER EDUCATION, DEPT. OF
An auxiliary facility at the University of Colorado may be a government-owned business qualifying as an enterprise under TABOR, even if it provides services both to the University and to external customers on a fee for service basis, and relies on the revenues from both sources in order to be self sustaining. Revenues received from the provision of goods and services by an enterprise approved pursuant to section 23-5-101.5, C.R.S. (1994 Supp.) may be pledged to the payment of debt service requirements on revenue bonds issued on behalf of such enterprises without violating Article XI, Section 3 of the Colorado Constitution even though such revenues are generated in part by funds received by the enterprise from the University for services provided to the University.
[1] However, the Court went on to note that the Authority also had the power to levy taxes in order to finance its activities, and concluded that including a taxing authority within the TABOR definition of "enterprise" is inconsistent with the terms of the definition considered as a whole. Specifically, the Court noted that if an entity has the power to impose taxes, the limitation on receipt of government "grants" from governmental entities with the power of taxation would become unnecessary since the enterprise could simply raise its revenues independently from the same sources. Accordingly, the Court concluded that "the power to unilaterally impose taxes, with no direct relation toservices provided, is inconsistent with the characteristics of a business as the term is commonly used". Id. at 869 (emphasis added).
[2] We realize that the term "government-owned business" appears to be an oxymoron, since government is non-profit. However, it is axiomatic that such provisions must be construed to give effect to the words used. See Longbottomv. State Board of Community Colleges, 872 P.2d 1253
(Colo.App. 1993). Consequently, we believe that the phrase refers to activities that are conducted in a business-like manner.
[3] Indeed, in 1993 the General Assembly enacted a similar law governing enterprise status for water activities, which also specifically excluded from the term "grant" "public funds paid or advanced to a water activity enterprise by the state or a local governmental entity or district in exchange for an agreement by a water activity enterprise to provide services . . . ." Section37-45.1-102(2), C.R.S. (1994 Supp.). Again, it is clear that payments made by a governmental entity for services provided by the enterprise were specifically contemplated by the legislature.
[4] It should be noted that in Nicholl, the Supreme Court held that the restrictions in section (4)(b) of TABOR apply to revenue bonds. However, this would not affect revenue bonds issued by or on behalf of enterprises, which are exempted by TABOR from the restrictions applicable to districts.
[5] For example, if the University decreased its demand for heat and air conditioning, the revenues of the cogeneration facilities would presumably diminish, but the bondholders would have no right to compel the University to continue to buy more heat or air conditioning, or to make up any shortfall.