**TIVOLINO TELLER HOUSE, INC., Plaintiff–Appellant,**

v.

**Renny FAGAN, in his capacity as the Executive Director of the Colorado Department of Revenue; Colorado Limited Gaming Control Commission; and the State of Colorado Department of Revenue, Defendants–Appellees.**

No. 95SA283.

Supreme Court of Colorado,
En Banc.

Nov. 4, 1996.

Rehearing Denied Nov. 25, 1996.

Lentz, Evans and King, P.C., Robert A. Wherry, Jr., Thomas E. McCarty, Denver, for Plaintiff–Appellant.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Maurice Knaizer, Deputy Attorney General, Larry A. Williams, First Assistant Attorney General, Thomas D. Fears, Assistant Attorney General, General Legal Services Section, Denver, for Defendants–Appellees.

Justice MULLARKEY delivered the Opinion of the Court.

On joint motion of plaintiff-appellant, Tivolino Teller House, Inc. (Tivolino) and the defendants, Executive Director of Revenue, Renny Fagan, the Colorado Limited Gaming Control Commission, and the Colorado Department of Revenue (collectively described as the Department), the court of appeals certified this appeal to the Supreme Court pursuant to section 13–4–109, 6A C.R.S. (1987), and we accepted jurisdiction.[1] Tivolino appeals the Denver District Court's order in *Tivolino Teller House, Inc. v. Fagan*, No. 94CV2549 (Colo. Dist. Ct. June 1, 1995), which granted summary judgment for the Department, affirming the result of the ruling of the Colorado Limited Gaming Control Commission (Commission) which upheld the denial of Tivolino's claim for refund by the Director of the Division of Gaming (Director). The district court, interpreting article XVIII, section 9(4)(a) of the Colorado Constitution and section 12–47.1–103(1), 5B C.R.S. (1991), held that Tivolino's promotional Casino Slot Club payouts are not deductible as "payments to players" for purposes of computing taxable adjusted gross proceeds. We affirm.

## I.

Tivolino, a Colorado corporation, operates a casino in Central City. Tivolino offers free memberships in a slot club program (the Program) to all patrons at least 21 years of age. As part of the Program, an eligible patron receives a membership card which identifies the patron when the card is inserted into any slot, video poker, or keno machine. With the card inserted, members receive a "bonus point" for every dollar they spend on the machines. Members receive the bonus point for having placed the wager, regardless of its outcome. The bonus points then may be redeemed in 200 point incre-

---

**1.** Section 13–4–109 provides in relevant part:

(1) The court of appeals, prior to final determination, may certify any case before it to the supreme court for its review and final determination, if the court of appeals finds:

(a) The subject matter of the appeal has significant public interest;

(b) The case involves legal principles of major significance; or

(c) The case load of the court of appeals is such that the expeditious administration of justice requires certification.

ments. Members receive one dollar for every 200 points redeemed.

Tivolino considered the Program payouts to be excludable from its "adjusted gross proceeds" as that term is defined by section 9(4)(a) of article XVIII of the Colorado Constitution (the Limited Gaming Amendment). Because the Division of Gaming treated the payouts as non-deductible, pursuant to Rule 47.1–1613, 1 C.C.R. 207–1 (1991) (Colorado Gaming Regulation 1613), Tivolino did not deduct Program payouts in computing its adjusted gross proceeds for the taxable periods ending on the last day of February, March, and April, 1993. The non-deducted Program payout amounts for the period at issue equalled $6,275.00, $14,348.00, and $21,279.00, respectively. Tivolino then filed timely requests for refunds with the Department.

The Director denied Tivolino's claims for a refund, and Tivolino subsequently filed a request for a hearing with the Commission. The Commission ruled against Tivolino, upholding the Director's denial of a refund. Tivolino then appealed the Commission's decision to the Denver District Court (district court). Both parties submitted motions for summary judgment, and the district court granted summary judgment for the Department.

Tivolino appealed the district court's decision to the court of appeals, and on joint motion of the parties the court of appeals certified the case to the supreme court pursuant to section 13–4–109, 6A C.R.S. (1987).

## II.

Summary judgment is appropriate only if the pleadings and supporting documents demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *Graven v. Vail Assocs.*, 909 P.2d 514, 516 (Colo.1995). The burden is on the moving party to establish that no genuine issue of fact exists and

any doubts in this regard must be resolved against the moving party. *Peterson v. Halsted*, 829 P.2d 373, 376 (Colo.1992).

Here, the parties stipulated to the facts and we agree, as did the district court, that the case presents solely a question of law. The issues presented in this case are the proper interpretation of the language of section 9(4)(a) of the Limited Gaming Amendment and the validity of Colorado Gaming Regulation 1613.

The Limited Gaming Amendment was adopted by the voters in the 1990 general election and became effective through the Governor's proclamation on January 3, 1991. The Limited Gaming Amendment legalized limited gaming in Central City, Black Hawk, and Cripple Creek as of October 1, 1991. In 1991, pursuant to the Limited Gaming Amendment, the General Assembly enacted the Limited Gaming Act of 1991 (Limited Gaming Act). §§ 12–47.1–101 to –1501, 5B C.R.S. (1991 & 1996 Supp.). The Limited Gaming Act provides for the creation of "the division of gaming" within the Department of Revenue. § 12–47.1–201, 5B C.R.S. (1991). Section 9(2) of the Limited Gaming Amendment also mandated the creation of a limited gaming control commission, and thus section 12–47.1–301 of the Limited Gaming Act provides for the creation of the Colorado Limited Gaming Control Commission within the Division of Gaming.

Section 9(4)(a) of the Limited Gaming Amendment defines "adjusted gross proceeds" as follows:

"Adjusted gross proceeds" means the total amount of *all wagers made by players on limited gaming less all payments to players;* said payments to players being deemed to include all payments of cash premiums, merchandise, tokens, redeemable game credits, or any other thing of value.

Colo. Const. art. XVIII, § 9(4)(a) (emphasis added).[2] Colorado Gaming Regulation 1613

---

2. Section 12–47.1–103 of the Limited Gaming Act of 1991 is almost identical to the language of Colo. Const. art. XVIII, § 9(4)(a), providing in pertinent part:

(1) "Adjusted gross proceeds"... means the total amount of all wagers made by players on limited gaming less all payments to players; and payment to players shall include all payments of cash premiums, merchandise, tokens,

limits deductions for promotional expenses and states in relevant part:

(1) A licensee who engages in promotions to increase business and gaming at his business may not deduct payouts made pursuant to the promotion from adjusted gross proceeds except for money or tokens paid at face value directly to a patron as the result of a specific wager. A specific wager requires two or more persons to stake something of value on an event, the outcome of which is uncertain. Depending upon the outcome, the winning party receives everything that was staked. If only one party risks something of value, there is no wager.

(2) No deduction is allowed in the computation of adjusted gross proceeds for any prizes, premiums, drawings, benefits, or tickets that are redeemable for money, merchandise, or other promotional allowances.

Rule 47.1–1613, 1 C.C.R. 207–1 (1991).

Tivolino advances two alternative arguments. Tivolino's main argument is that Program payouts are included within the clear meaning of "payments to players" in the Limited Gaming Amendment and Limited Gaming Act and that Colorado Gaming Regulation 1613 is improper and invalid. Alternatively, Tivolino contends that because members are guaranteed to receive .5¢ on the dollar for every $200 spent, only 99.5¢ of every dollar spent by Program members constitutes a wager. Thus, Tivolino argues that .5¢ of every dollar spent by Program members should be excluded from taxable "wagers made by players," and that it is entitled to a refund of the amounts that were erroneously included in the computation of its taxable "adjusted gross proceeds."

Before addressing Tivolino's arguments, we will briefly summarize the familiar rules of statutory construction applicable in this case:

■■■■ Where a constitutional amendment or statute contains plain, clear language, we do not resort to rules of construction to construe its meaning. *Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization,* 761

P.2d 197, 202 (Colo.1988); *Colorado State Civil Serv. Employees Ass'n v. Love,* 167 Colo. 436, 444–45, 448 P.2d 624, 627 (1968). Where the language is ambiguous, however, several well-established principles guide us in construing a constitutional amendment. Our primary task is to "ascertain and give effect to the intent of those who adopted [the amendment]." *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988) (citing *Cooper Motors v. Board of County Comm'rs,* 131 Colo. 78, 83, 279 P.2d 685, 688 (1955)). In the case of constitutional amendments adopted by popular vote, we must consider the intent of the voters in enacting the provision, and to that end, we must give the words of the amendment their natural and popular meaning. *Urbish,* 761 P.2d at 760. In addition, however, we must give deference to the reasonable interpretations of the administrative agencies that are authorized to administer and enforce the law. *North Colo. Medical Ctr., Inc. v. Committee on Anticompetitive Conduct,* 914 P.2d 902, 907 (Colo.1996); *Urbish,* 761 P.2d at 761. We have said that "administrative regulations are presumed valid and will be set aside only when the challenging party establishes their invalidity beyond a reasonable doubt." *Urbish,* 761 P.2d at 761 (citations omitted). With these principles in mind, we turn to Tivolino's arguments.

### III.

#### A.

Tivolino argues that the constitutional and parallel statutory language defining "adjusted gross proceeds" is clear and that we need not resort to rules of construction. The district court agreed that the constitutional provision at issue is clear, but concluded that the Commission and Department's interpretation of it is the correct one. Considering the sentence defining "adjusted gross proceeds" as a whole, the district court found specifically that "the legislature considered 'payments to players' an integral part of 'wagers made by players.'" Then, citing Colorado Gaming Regulation 1613 for the definition of a "wager," the district court held that "because the $1 is not earned as the result of a specific

redeemable game credits, or any other thing of value.

wager it is not a 'payment to the player' as contemplated by the legislature, and therefore is not deductible from [Tivolino's] adjusted gross income." The district court thus found the provision at issue to be unambiguous, relying in part on Colorado Gaming Regulation 1613 without considering the regulation's validity. While we affirm the district court's decision, we find the constitutional provision at issue to be ambiguous, and the Commission's promulgation of Colorado Gaming Regulation 1613 to be valid.

Tivolino argues at the outset that in the event we determine the provision to be ambiguous, we must follow the well-established rule that any ambiguity in taxing statutes must be strictly construed against the taxing authority. The Department, on the other hand, maintains that Tivolino is seeking a tax exemption, and that the burden is on the taxpayer to prove entitlement to an exemption. We conclude that neither rule is applicable here. The constitutional provision and enacting legislation themselves provide the means to resolve the ambiguity by authorizing the Commission to issue regulations. Once the Commission has spoken, as it has done here by duly promulgating the regulation at issue, the ambiguity is resolved. Absent a successful challenge to the regulation, all that remains to be done is to apply the rule to the facts of a particular case.

By promulgating Colorado Gaming Regulation 1613, the Commission has specified that deductible "payments to players" do not include promotional expenses except for those incurred through the payment of money or tokens at face value directly to a patron as the result of the outcome of a specific wager. The regulation further defines a "specific wager" as requiring two or more parties to risk something of value. Tivolino concedes that Program payouts are promotional and has labeled such programs, which are run by several casinos in addition to Tivolino, "promotional slot clubs." Thus, if the regulation is valid, Tivolino's argument clearly fails.

Tivolino argues, however, that section 9(4)(a) and section 9(2) of the Limited Gaming Amendment provide the scope of the Commission's authority to define "adjusted gross proceeds." In particular, Tivolino maintains that the term "adjusted gross proceeds" is clearly defined in section 9(4)(a) of the Limited Gaming Amendment, and that Colorado Gaming Regulation 1613 is invalid because it alters the definition of "adjusted gross proceeds." We hold that Tivolino's argument is not supported by the constitution and that the regulation is a proper exercise of the Commission's delegated power.

■ We find that the definition of "adjusted gross proceeds" is ambiguous. While "adjusted gross proceeds" is a commonly used tax term, the term is always specific to the taxing scheme of which it is a part. Although the Limited Gaming Amendment and Limited Gaming Act provide a definition of "adjusted gross proceeds," the words comprising the substantive definition are themselves in need of definition, rendering the term ambiguous.

In particular, the Department contends, and we agree, that the text of the constitutional provision and parallel statute does not clearly restrict or define the scope of "payment to players." Considering the provision as a whole, the department argues and the district court found that the language clearly indicates that "wagers made by players" is an integral part of "payments to players" and that Colorado Gaming Regulation 1613 provides the definition and clarification of the terms "wager" and "payment." Tivolino argues, on the other hand, that the clear meaning of the individual words "wager," "player," "all," and "payments" leads undeniably to the conclusion that the Program payments qualify for a deduction under the terms of the provision. Because the language of the constitutional amendment is reasonably susceptible to more than one interpretation, the language is ambiguous. *Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo.1996).

■ The Limited Gaming Amendment provides for the creation of a commission that is authorized to resolve possible ambiguities in the language of the Amendment. Section 9(2) of the Limited Gaming Amendment specifically mandates:

The administration and regulation of this section 9 shall be under an appointed limit-

ed gaming control commission, referred to in this section 9 as the commission; ... The commission shall promulgate all necessary rules and regulations relating to the licensing of limited gaming.... Such rules and regulations shall include *the necessary defining of terms that are not otherwise defined.*

Colo. Const. art. XVIII, § 9(2) (emphasis added). Thus, while the amendment is unclear as to the meaning of "payments to players," the amendment is perfectly clear in its provision for a commission authorized to define otherwise undefined terms, e.g., "payments to players." Because the term "payments to players" is ambiguous, we find that the Commission's interpretation of the term with regard to promotional expenses does not redefine an otherwise defined term and that the Commission promulgated Colorado Gaming Regulation 1613 pursuant to its delegated constitutional and statutory authority.[3]

■ Tivolino additionally argues that Colorado Gaming Regulation 1613 is invalid because it was adopted nearly verbatim from South Dakota's regulations and therefore is inappropriate and improper for the purpose of interpreting Colorado law. In the stipulation of facts to the district court, the Department concedes that Colorado Gaming Regulation 1613 was taken from South Dakota's regulations. However, the Commission is not prohibited from drafting and adopting regulations in this manner. In fact, the Limited Gaming Act provides specifically that the Director of the Division of Gaming is to "[m]ake a continuous study and investigation of the operation and administration of similar laws which may be in effect in other states or countries ... with a view to recommending or effecting changes that would serve the

purposes of this article." § 12–47.1–203(2)(h), 5B C.R.S. (1996 Supp.). Tivolino argues, nonetheless, that the differences between Colorado's and South Dakota's statutory provisions regarding the gaming tax render the application of South Dakota regulations to Colorado law invalid. We disagree.

Tivolino insists that the differences between South Dakota's and Colorado's statutory provisions indicate that the two states have chosen very different taxing schemes. In particular, Tivolino highlights the two states' definitions of "adjusted gross proceeds" and their provisions regarding the gaming tax rate. While Colorado's Limited Gaming Act defines "adjusted gross proceeds" as "all wagers made by players on limited gaming less all payments to players," § 12–47.1–103(1), 5B C.R.S. (1991), the parallel South Dakota statutory provision regarding taxable income defines "adjusted gross proceeds" as "gross proceeds less cash prizes." S.D. Codified Laws Ann. § 42–7B–4(1) (1989). Additionally, Colorado's law imposing the gaming tax states in part:

There is hereby imposed a gaming tax on the adjusted gross proceeds of gaming allowed by this article. The tax shall be set by rule promulgated by the commission. In no event shall the tax exceed forty percent of the adjusted gross proceeds.

§ 12–47.1–601(1), 5B C.R.S. (1991). In contrast, the original South Dakota statute imposing the gaming tax stated in part: ·

There is hereby imposed an eight percent gaming tax on the adjusted gross proceeds of gaming allowed by this chapter until June 30, 1990. After June 30, 1990, the tax shall be eight percent unless increased

---

**3.** As part of its argument, Tivolino asserts that the term "premium" has a very specific definition which is inconsistent with the definition of "wager" provided in Colorado Gaming Regulation 1613. Citing *Las Vegas Hacienda, Inc. v. Gibson,* 77 Nev. 25, 359 P.2d 85 (1961), for the "definitive meaning" of "premium" in the gambling context, Tivolino argues that, in contrast to a "wager," a "premium" does not involve risk, because the party offering the premium must lose if the accepting party abides by the offer. Thus, Tivolino concludes that "[b]ecause the constitutional provision[ ] allows for deductions with respect to all payments to players, *including cash* premiums,* 'all payments' clearly is not limited to those paid as the result of a winning wager." However, the Department counters Tivolino's argument by highlighting two dictionary definitions of "premium" that differ from the *Gibson* definitions and are consistent with the Commission's interpretation of the Colorado Constitution. As with the other terms comprising the definition of "adjusted gross proceeds," we find that the term "premium" is subject to more than one possible interpretation and that the Commission has the authority to define the term pursuant to article XVIII, section 9(2) of the Colorado Constitution.

or decreased in a rule promulgated by the commission in a range of not less than five percent but no more than fifteen percent. S.D. Codified Laws Ann. § 42–7B–28 (1989).

While the provisions cited by Tivolino do differ, the variations do not render Colorado Gaming Regulation 1613 invalid. In fact, the difference between the states regarding the gaming tax rate suggests that Colorado is more concerned than South Dakota with minimizing the profits of limited gaming licensees and maximizing the revenue generated by taxes levied against such licensees. The adoption of a regulation that serves to limit deductions for promotional expenses is certainly consistent with such a goal. A consideration of the purposes behind the Limited Gaming Amendment further persuades us of the propriety of Colorado Gaming Regulation 1613.[4]

The amendment in this case was an initiative adopted by the voters in a general election, and therefore there is no traditional legislative history available to further clarify the purposes of the amendment. The Legislative Council of the Colorado General Assembly (Council), however, publishes analyses of ballot proposals to provide information to the voters, stating arguments for and against each proposal.

Although the Council's interpretation of a proposed amendment is not binding, the analyses provide "important insight into the electorate's understanding of the amendment when it was passed." *Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization*, 761 P.2d 197, 203 (Colo.1988). Thus, in past cases, we have found these publications helpful in the construction of constitutional amendments. *See In re Proposed Initiative "Public Rights in Waters II"*, 898 P.2d 1076, 1079 n. 5 (Colo.1995); *Colorado Common*

*Cause v. Bledsoe*, 810 P.2d 201, 208–09 n. 8 (Colo.1991); *Carrara Place, Ltd.*, 761 P.2d at 203. The Council's information on the Limited Gaming Amendment included the following in the "Arguments For" section:

1) Limited gambling would help to ensure the preservation of historic buildings.... [L]egalized gambling would help raise the necessary funds to restore the historic character of the designated towns without burdening the taxpayers of Colorado or the citizens of the communities....

2) ... Almost half of the tax revenue generated will go to the state general fund to be shared throughout the state.

....

4) ... The proposal is designed to eliminate the incentive of high profits which attract high dollar investors and organized crime. By limiting the possibility of excessive profits, any attempt at exploitation by outsiders will be limited. The proposal sufficiently taxes the net revenues from gambling to ensure that all increased expenditures necessary for the set-up, regulation and enforcement will be funded directly from the revenue received. The financing of historic preservation, improvement of municipal infrastructure, and increased law enforcement resources are to be funded from gambling revenues.

Legislative Council of the Colo. Gen. Assembly, *An Analysis of 1990 Ballot Proposals*, Research Pub. No. 350 at 16–17 (1990).

As indicated by the Council's pamphlet, the arguments in favor of limited gaming that were presented to the public emphasized the purpose of collecting revenues to provide for historic restoration and to contribute to the state general fund. *Id.* Disallowing the deduction of promotional expenses is certain-

---

4. Tivolino advances a third argument that Colorado Gaming Regulation 1613 is invalid because the regulation's definition of a wager is "intuitively incorrect." Specifically, Tivolino contends that slot machine bets do not satisfy the regulation's requirement that the "winning party receives everything that was staked," because, while the casino stakes the entire jackpot each time players insert a coin into the machine, players do not receive the entire jackpot each time they win. However, Tivolino's argument relies on an improper definition of "winner." As the

Department points out, players may win different amounts on a slot machine depending upon the final combination or alignment of the individual slot reels, as shown in the pay-tables (pay-tables are the charts, usually painted on slot machine cases, that illustrate the amount players will win with specific combinations of the slot reels). Thus, Tivolino's interpretation of a "winner" is too restrictive, because it assumes that the casino must stake and the player must receive the entire jackpot to "win." We are therefore unpersuaded by Tivolino's third argument.

ly consistent with the stated purpose of producing "significant revenues" and decreasing incentives for "high dollar investors and organized crime." [5]

■ In addition, courts generally give deference to administrative interpretations of statutes by the agencies charged with their administration and enforcement. *El Paso County Bd. of Equalization v. Craddock*, 850 P.2d 702, 704–705 (Colo.1993). However, courts are not bound by agency regulations which misconstrue or misapply the law. *Id.; Boulder County Bd. of Equalization v. M.D.C. Constr. Co.*, 830 P.2d 975, 981 (1992); *Golden Aluminum v. Weld County Bd. of County Comm'rs*, 867 P.2d 190, 192 (Colo. App.1993). In particular, we have stated that "[w]hile the construction of a statute by the agency charged with its enforcement is entitled to deference, courts are not bound by that construction where the result reached by the agency is inconsistent with legislative intent as manifested in the statutory text." *M.D.C. Constr. Co.*, 830 P.2d at 981 (citations omitted).

In *Golden Aluminum*, the court of appeals considered an administrative agency interpretation of a statutory two-year time limit for filing a petition for a tax refund or abatement. The statute at issue in that case stated that the petition must be filed "'within two years *after January 1* of the year following the year in which the taxes were levied.'" *Golden Aluminum*, 867 P.2d at 191 (citing § 39–10–114(1)(a)(I)(A), 16B C.R.S. (1993 Supp.)) (emphasis added). Despite the clear statutory language, however, the property tax administrator had drafted and circulated a memorandum stating that petitions "must be received ... 'no later than December 31 of the second year following the year the taxes were levied'" in order to be considered timely filed. 867 P.2d at 192. The court of

appeals held that the administrative interpretation was contrary to the plain meaning of the statutory language. *Id.*

In *M.D.C. Construction Co.*, this court considered the issue of the proper classification of a landowner's land for purposes of property tax assessment. 830 P.2d at 977. The Board of Assessment Appeals had determined that the landowner's land was not entitled to assessment as "agricultural land" as defined under sections 39–1–102(1.6),– 102(13.5), 16B C.R.S. (1987 Supp.). "Agricultural land" was defined under the statute in pertinent part as "a parcel of land which was used the previous two years and presently is used as a farm or ranch, as defined in subsections (3.5) and (13.5) of this section." § 39–1–102(1.6)(a), 16B C.R.S. (1987 Supp.). In addition, a "ranch" was defined as "a parcel of land which is used for grazing livestock for the primary purpose of obtaining a monetary profit." § 39–1–102(13.5), 16B C.R.S. (1987 Supp.).

This court found that there was no question that the landowner's lessees had used the land as a ranch or farm land at the time of the property assessment and for the two year period preceding the assessment. *M.D.C. Constr. Co.*, 830 P.2d at 981. In particular, the record showed that the lessees had been raising cattle and boarding and breeding horses on the landowner's property for the three years preceding the assessment. *Id.* This court also found that the lessees had provided essentially undisputed testimony that the primary objective of their agricultural activities was to make a profit. *Id.* at 982. However, the Board of Assessment Appeals had interpreted the statute to require that the "primary purpose" of making a profit from agricultural activities applied to the intent of the landowner rather than to the activities and land use of the

---

**5.** Although Tivolino points us to the petitions used to place the amendment on the ballot, the language of the petition forms provides no greater insight into the intent of the voters. One version of the petition provided solely the text of the proposed amendment. A second version presented the title setting board's summary of the proposal, including a fiscal impact statement, which the board was required to draft pursuant to § 1–40–101(3), 1B C.R.S. (1980) (amended at § 1–40–106(3)(a), 1B C.R.S. (1996 Supp.)). The

last line of the second version states that "[t]he measure is expected to have a significant fiscal impact and to produce significant revenues, the amounts of which are indeterminate." Thus, the text of the petitions themselves contained little more than the verbatim text of the adopted amendment, and the only indication of what factors on which voters may have focused supports the conclusion that the voters were most concerned with the production of "significant revenues."

lessees. *Id.* at 978. Finding no indication of this requirement in the statute, this court concluded that the "interpretation adopted by the Board of Assessment Appeals [was] contrary to the plain terms of the statute." *Id.* at 981.

Unlike *Golden Aluminum* and *M.D.C. Construction Co.,* we do not have before us an administrative interpretation contrary to the plain language of a statute. We are confronted here with the language of a constitutional amendment, rather than a legislative statute, with terms which are ambiguous and subject to more than one reasonable interpretation. Thus, we find that the Commission has acted appropriately and within its authority in promulgating Colorado Gaming Regulation 1613, and that the Commission's definition is a reasonable interpretation of the constitutional language, and consistent with its purposes. Because we find Colorado Gaming Regulation 1613 to be valid and Tivolino's Program payouts to be non-deductible promotional expenses according to that regulation, we affirm the decision of the district court and hold that Tivolino's Program payouts do not qualify as deductible "payments to players" under section 9(4)(a) of the Limited Gaming Amendment.

### B.

■ Tivolino argues as an alternative theory that the Program payouts result in members actually wagering only 99.5¢ of every $1.00 they bet, because they are guaranteed to receive $1.00 for every $200 spent. Therefore, Tivolino claims a refund of .5¢ for every program member bet that Tivolino included as taxable "wagers by players." Tivolino cites the Commission's conclusions of law in support of its position. The Commission found specifically that:

> The Tivolino program does not involve the application of risk to the outcome; a member knows from the outset that there will be a return of $1 for every $200 dropped into the slot. The effect of the slot club is to allow its members to place 99.5 cent wagers instead of $1 wagers, with the winnings resulting therefrom being paid at $1 face value. Tivolino enjoys no benefit of

risk; it *must* pay the money to all qualifying members.

The district court found Tivolino's argument and the Commission's conclusion regarding the effect of the Program payouts without merit, and we agree.

We find that Tivolino's alternative theory is not supportable. As the district court found, adoption of Tivolino's alternative theory would result in the violation of Rule 47.1-1307, 1 C.C.R. 207-1 (1991) (Colorado Gaming Regulation 1307), which provides in relevant part that "[w]here a retail licensee redeems chips and tokens, it must redeem all chips and tokens at the value for which they were sold." The district court stated that Tivolino's alternative theory assumes that Program members purchase tokens at 99.5¢ on the dollar, but that Tivolino redeems the Program member's winnings at a full dollar.

Tivolino argues, however, that its theory does not require such an assumption. Tivolino contends that tokens purchased by Program members and non-Program members alike are purchased for one dollar and that the fact that 99.5¢ on the dollar is all a Program member can lose does not mean that the member pays less than one dollar for the token. Tivolino concludes, rather, that the Program payouts "in substance reduce[ ] the amount of each of the member's wagers to 99.5¢." We disagree.

We find, in accord with the district court, that Program members purchase tokens for one dollar and have their tokens redeemed for the same amount. The Program does not, in reality, reduce each individual one dollar wager by .5¢. A Program member only receives the credit of .5¢ for every dollar spent if the member spends a total of $200. Thus, a Program member is not guaranteed to receive a .5¢ credit on every dollar spent, and the Program member therefore must wager one dollar for every individual dollar spent.

Because we find that the Program does not result in individual 99.5¢ wagers, we affirm the decision of the district court and deny Tivolino's claim under its alternative theory.

### IV.

We hold that the Commission interpreted the term "payments to players" as found in article XVIII, section 9(4)(a) of the Colorado Constitution pursuant to its constitutional authority under article XVIII, section 9(2) to define otherwise undefined terms. Because we find that Tivolino's Program payouts do not qualify as deductible promotional expenses paid out to players as the direct result of a specific wager, as that term is defined by Colorado Gaming Regulation 1613, we affirm the district court's decision and hold that Tivolino's Program payouts are not deductible from adjusted gross proceeds.

KIRSHBAUM, J., dissents, and LOHR, J., joins in the dissent.

### Justice KIRSHBAUM, dissenting:

This appeal raises two questions: the validity of Rule 47.1–1613, 1 C.C.R. 207–1 (1991), adopted by the Colorado Limited Gaming Commission, and its application to certain payments made by appellant Tivolino Teller House, Inc. to patrons who wagered at least $200 pursuant to the terms of a Casino Slot Club program established by Tivolino. Tivolino concedes that the program is promotional for purposes of the rule. In Part III A of its opinion the majority determines that Regulation 1613 does not violate article XVIII, section 9(4)(a), of the Colorado Constitution or section 12–47.1–103(1), 5B C.R.S. (1991), and that the Gaming Commission properly excluded those payments for purposes of computing Tivolino's adjusted gross proceeds. In Part III B of its opinion the majority concludes that those payments must be deemed sums wagered by the participating members.[1] I respectfully disagree with the majority's analyses and ultimate determination in Part III B of its opinion. On the

basis of the record here, I conclude that the payments to participating members of the Casino Slot Club can not be taxed because such payments are not "wagers" for purposes of section 12–47.1–103(1). I therefore would not address the question of the validity of Regulation 1613, and respectfully dissent from the majority opinion.

The General Assembly has defined the term "adjusted gross proceeds" for purposes of tax liability as follows:

> "Adjusted gross proceeds" ... means the total amount of all wagers made by players on limited gaming less all payments to players.

§ 12–47.1–103(1), 5B C.R.S. (1991).[2] The General Assembly has thus determined that only sums wagered may be considered to constitute a portion of a casino's adjusted gross proceeds. Thus, the pivotal question in this case is whether the sums received by patrons who in fact claim reimbursement from Tivolino pursuant to the terms of the Casino Slot Club program are sums wagered for purposes of the statute.

Under the terms of that program, a club member is entitled to receive a payment of one dollar for every 200 dollars wagered by that patron. Tivolino asserts that those participating members who receive the guaranteed payments in fact wager only 99.5 cents of each dollar they spend in playing the slot machines because such patrons are guaranteed a return of .5 cent for each such expenditure. I find Tivolino's argument persuasive, and conclude that participating members do not wager the .5 cent per dollar they are guaranteed to receive.

As the majority notes, the Commission concedes that "the effect of the slot club is to allow its members to place 99.5 cent wagers instead of $1 wagers," such that the .5 cent

---

1. For purposes of this dissenting opinion, the term "participating members" refers to those members of the Casino Slot Club program who actually wager amounts of at least $200 and also elect to claim the benefits per $200 wagered. Tivolino makes payments only with regard to wager units of $200. Thus, a player who wagers $300 is paid $1, and under Tivolino's theory the sum of $299 would be reported as the amount wagered by that player for purposes of calculating Tivolino's adjusted gross proceeds.

2. The Gaming Commission has further defined "wager" in Gaming Regulation 1613: "A specific wager requires two or more persons to stake something of value on an event, the outcome of which is uncertain. Depending upon the outcome, the winning party receives everything that was staked. If only one party risks something of value, there is no wager." Rule 47.1–1613, 1 C.C.R. 207–1 (1991); maj. op. at 1211.

per dollar retained by participating members is never subject to any risk of loss and never actually wagered. Maj. op. at 1216. However, the majority suggests that such acknowledgement, if accepted as dispositive, would result in the conclusion that the program violates Rule 47.1–1307, 1 C.C.R. 207.1 (1991), (Colorado Gaming Regulation 1307), by effectively allowing participating members to purchase tokens for 99.5 cents and later redeem them for one dollar. Maj. op. at 1216.

However, the stipulated facts require a contrary conclusion. A participating member can not purchase $199 in tokens and later redeem them for $200. To the contrary, participating members and all other casino patrons of Tivolino initially purchase tokens at face value and, presumably, redeem all unused tokens for the same face value. Furthermore, there is no basis in the record to assume, as the majority appears to do, that all Casino Slot Club members become participating members every time they visit Tivolino. For example, a club member may elect to purchase only $150 worth of tokens—or elect not to redeem a completed card. There is no prohibited redemption and thus no violation of Colorado Gaming Regulation 1307.

The majority recognizes these possible scenarios but suggests that because Casino Slot Club members are "not guaranteed to receive a .5¢ credit on every dollar spent," such .5 cent sum must be deemed a wager. Maj. op. at 1216. In my view, this analysis fails to recognize the fact that Tivolino seeks to exclude from its adjusted gross proceeds only those sums actually paid to members who claim the guarantee—that is, sums paid to participating members. Casino Slot Club members who wager less than $200 or who elect not to claim the guarantee receive no payments, and payments are made only with respect to $200 wager units. In my view, the majority's analysis does not address the fact that only participating members receive a guaranteed payment equal to .5 cent for each dollar spent in playing the slot machines. That guaranteed payment is not subject to any risk of loss.

In these circumstances, for purposes of section 27–47.1–103(1) participating members wager only 99.5 cents of each dollar's worth of tokens spent on playing the slot machines. Accordingly, Tivolino is entitled to exclude the guaranteed payments of .5 cent guaranteed for each dollar spent by participating members from the amount reported as wagers pursuant to such statute. I therefore conclude that Tivolino is entitled to the tax refunds it claims, and respectfully dissent from the majority's contrary determination.

I am authorized to say that Justice LOHR joins in this dissent.