David HARWOOD, Petitioner–Appellant,

v.

SENATE MAJORITY FUND, LLC, Respondent–Appellee,

and

Division of Administrative Hearings, Appellee.

No. 05CA1925.

Colorado Court of Appeals, Div. A.

June 29, 2006.

Isaacson Rosenbaum P.C., Mark G. Grueskin, Blain D. Myhre, Daniel C. Stiles, Denver, Colorado, for Petitioner–Appellant.

Hackstaff Gessler LLC, Scott E. Gessler, Denver, Colorado, for Respondent–Appellee.

No Appearance for Appellee.

ROMÁN, J.

In this administrative appeal concerning the Campaign and Political Finance Amendment, Colo. Const. art. XXVIII (the Amendment), and the Fair Campaign Practices Act, § 1–45–101, et seq., C.R.S.2005 (FCPA), complainant, David Harwood, appeals the Division of Administrative Hearings order entered in favor of defendant, Senate Majority Fund, LLC (SMF). We affirm.

SMF hired Vitale and Associates (V & A) to conduct a telephone opinion poll to gauge public opinion before the November 2004 election. When conveying poll results to its clients, V & A provides information regarding the chance of a candidate's success, key issues in the race, developing election trends, and whether a campaign is worth continuing. In this case, V & A conducted a poll and provided SMF this information so that SMF could formulate a political strategy and decide how to allocate funds for radio advertisements and direct mailings.

In October 2004, V & A polled 300 likely voters in each of five state senate districts. At the beginning of each call, V & A pollsters would say, "Hello, I'm _____ of V & A Research, a national public opinion research firm." They then would ask a series of questions, including: (1) "Are you registered to vote in Colorado?", (2) "What is the likelihood of your voting [in] the November elections for federal and state office?"; (3) "If the election for State Senate were being held today, and you had to make a choice, would you be voting for the Republican candidate or the Democrat[ic] candidate?", and. (4) "Thinking again about the election for the state senate—if the election was [sic] held today and you had to make a choice, for whom would you vote?"

The format of the latter question was repeated with respect to candidates for the United States Senate and President. Candi-

dates' names were rotated to ensure the order in which they were read did not affect poll results, and the poll did not provide positive or negative information about any candidate or urge respondents to vote for or against any candidate.

SMF reported its contributions and expenditures to the Colorado Secretary of State pursuant to the Amendment and the FCPA. The reported expenditures did not include payment to V & A for the October 2004 opinion poll.

Harwood filed a complaint with the Secretary of State alleging that SMF's failure to disclose funds spent for the opinion poll violated the Amendment and the FCPA because the poll constituted an "electioneering communication." Harwood sought imposition of a civil penalty. After a hearing, the administrative law judge (ALJ) found that the poll conducted by V & A did not constitute "electioneering communication" because it was made in the regular course and scope of business and therefore constituted an exception to the Amendment. *See* Colo. Const. art. XXVIII, § 2(7)(b)(III). The ALJ therefore denied Harwood's request that SMF be assessed a civil penalty.

■■■ Harwood contends on appeal that the ALJ erred in concluding that SMF was not required to disclose its expenditure on the poll because it does not fall within the regular course and scope of business exception to the definition of "electioneering communication." We affirm the ALJ's ruling, but on different grounds. *See Evans v. Romer*, 854 P.2d 1270 (Colo.1993).

## I. Electioneering Communication

Colo. Const. art. XXVIII, § 2(7)(a) defines "electioneering communication" as

> any communication broadcasted by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences or otherwise distributed that:
> (I) Unambiguously refers to any candidate; and
> (II) Is broadcasted, printed, mailed, delivered, or distributed within thirty days before a primary election or sixty days before a general election; and

> (III) Is broadcasted to, printed in a newspaper distributed to, mailed to, delivered by hand to, or otherwise distributed to an audience that includes members of the electorate for such public office.

■■■ The interpretation of a constitutional provision is a question of law we review de novo. In construing a constitutional provision, our obligation is to give effect to the intent of the electorate that adopted it. In giving effect to that intent, we look to the words used, reading them in context and according them their plain and ordinary meaning. Where ambiguities exist, we interpret the constitutional provision as a whole in an attempt to harmonize all its parts. *Bruce v. City of Colorado Springs*, 129 P.3d 988 (Colo.2006).

■■■ We consider the object to be accomplished and the mischief to be prevented by the provision. *City of Aurora v. Acosta*, 892 P.2d 264 (Colo.1995). Any interpretation that creates an unreasonable or absurd result should be avoided. *Bickel v. City of Boulder*, 885 P.2d 215 (Colo.1994).

### A. Communication

■■■ We first look at the terms of the Amendment itself and apply the constitutional provision according to its clear terms, giving effect to every word if possible. *See City of Aurora v. Acosta, supra.*

An "electioneering communication" means "any communication" that is distributed as described in Colo. Const. art. XXVIII, § 2(7)(a).

Because no Colorado appellate opinion interprets the term "electioneering communication" under the Amendment, in giving effect to the intent of the electorate we give "communication" its plain and ordinary meaning. *See Bruce v. City of Colorado Springs, supra.*

Dictionaries define "communication" as "the act or action of imparting or transmitting; facts or information communicated; interchange of thoughts or opinions" and "the expression or exchange of information by speech, writing or gestures; the information so expressed or exchanged." *Webster's Third New International Dictionary* 460

(1986); *Black's Law Dictionary* 273 (7th ed.1999). These definitions contemplate imparting a message to, rather than having mere contact with, another party.

In reviewing the scripts used by V & A here, we conclude "communication" occurred because "facts, information, thoughts, or opinions" were "imparted, transmitted, interchanged, expressed, or exchanged" by V & A to those it called. For example, one question stated:

> Now I would like to read you a list of issues that some people here in Colorado have said are important for the Colorado State Legislature to deal with. Please listen as I read the list and tell me which *one* issue you think is *most* important.

(Emphasis in original.) Members of the electorate then heard a list of ten issues, including health care, terrorism and homeland security, education, and water management, from which they were to choose.

This question "imparted, transmitted, interchanged, expressed, or exchanged" the "fact, information, thought, or opinion" that certain issues have been identified by "some people" as "important for the Colorado State Legislature to deal with." The questions also identified the candidates running for certain offices. Therefore, we conclude V & A communicated information to members of the electorate during its opinion poll. Our analysis does not end here, however. We turn next to what constitutes "electioneering."

### B. Electioneering

After analyzing the Amendment, the plain and ordinary meaning of the term "electioneering," and United States Supreme Court authority, we conclude the poll conducted by V & A was not "electioneering" and thus did not constitute an "electioneering communication."

### 1. Purpose of the Amendment

First, the express purposes for which the Amendment was adopted reveal that the electorate was concerned with regulating, not opinion polls, but rather speech designed to influence the outcome of Colorado elections. According to the Amendment itself, Colorado citizens adopted it in part because: (1) "large campaign contributions to political candidates create the potential for corruption and the appearance of corruption", (2) "large campaign contributions made to influence election outcomes allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process"; (3) "in recent years the advent of significant spending on electioneering communications ... has frustrated the purpose of existing campaign finance requirements"; (4) "the vast majority of televised electioneering communications goes beyond issue discussion to express electoral advocacy"; (5) "political contributions from corporate treasuries ... can unfairly influence the outcome of Colorado elections"; and (6) "the interests of the public are best served by ... providing for full and timely disclosure of ... funding of electioneering communications." Colo. Const. art. XXVIII, § 1. We find it significant that the Amendment makes no mention whatsoever of opinion polls.

Likewise, Colo. Const. art. XXVIII § 2(8)(a) explains that " '[e]xpenditure' means any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person *for the purpose of expressly advocating* the election or defeat of a candidate or supporting or opposing a ballot issue or ballot question" (emphasis added).

Moreover, courts may determine voter intent by considering other relevant materials, such as the ballot title and submission clause and the biennial Bluebook, which contains the analysis of ballot proposals prepared by the legislature. *Davidson v. Sandstrom,* 83 P.3d 648 (Colo.2004).

Here, the 2002 Bluebook states that "[t]he proposed amendment to the Colorado Constitution ... requires reporting and disclosure of money spent for certain *political advertisements.*" Colorado Legislative Council, Research Pub. No. 502–1, *2002 Ballot Information Booklet: Analysis of Statewide Ballot Issues* 1 (2002)(emphasis added).

The Bluebook's "Arguments For" section further states:

> Requiring greater disclosure of who pays for *political advertising* provides more information about who is spending *money* to *influence elections.* Now, some types of

political advertisements are not regulated and therefore can be paid for anonymously. The proposal gives people information about *who is paying for these advertisements* right before an election.

Colorado Legislative Council, *supra*, at 5 (emphasis added).

We conclude the Colorado electorate intended Article XXVIII to regulate communication that expresses "electoral advocacy" and tends to "influence the outcome of Colorado elections." *See City of Aurora v. Acosta, supra* (when interpreting a constitutional provision, courts must consider the object to be accomplished and the mischief to be avoided by the provision).

### 2. Definitions

Second, this conclusion is reinforced by the plain and ordinary meaning of the term "electioneering." *See Bruce v. City of Colorado Springs, supra* (in interpreting constitutional provisions, courts give terms their plain and ordinary meanings). "Electioneering" is defined as "tak[ing] an active part in an election campaign; campaign[ing] for one's own election; try[ing] to sway public opinion especially by the use of propaganda." *Webster's, supra*, at 731. "Campaigning" in turn is similarly defined as "influenc[ing] the public to support a particular political candidate, ticket, or measure." *Webster's, supra*, at 322.

### 3. Supreme Court Authority

Finally, we find it persuasive that the United States Supreme Court has used an intent-based approach in determining whether statements constitute "electioneering communication" under the Federal Election Campaign Act. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 189–94, 124 S.Ct. 619, 686–89, 157 L.Ed.2d 491 (2003). In *McConnell*, the Supreme Court recognized that the presence or absence of "magic words" does not meaningfully distinguish between electioneering and nonelectioneering speech, and that advertisements may be intended to influence the election even though their language may not directly urge the electorate to vote for or against a candidate.

Here, V & A's poll did not seek to influence voters or sway public opinion, but instead merely asked neutral questions to collect data and measure public opinion. Accordingly, we conclude the opinion poll conducted by V & A did not constitute "electioneering communication" under the Amendment.

### II. Other Contentions

Given this conclusion, we need not address the parties' other contentions.

The order is affirmed.

Judge LOEB and Judge HAWTHORNE concur.