David SANGER; American Federation of Teachers, Local 858, a Colorado membership organization; Colorado Federation of Teachers, School, Health, and Public Employees, a Colorado small donor committee; Walter Beckart, resident and citizen of Colorado; Vivian Stoval, resident and citizen of Colorado; Colorado Education Association, a Colorado membership organization; Public Education Committee, a Colorado small donor committee; Lynn Mason, resident and citizen of Colorado; Kerrie Dallman, resident and citizen of Colorado; and Michael Cerbo, candidate for State Representative from House District 2, Plaintiffs–Appellees,

v.

Ginette DENNIS, in her official capacity as Colorado Secretary of State, Defendant–Appellant.

No. 06CA1944.

Colorado Court of Appeals, Div. A.

Sept. 28, 2006.

Isaacson Rosenbaum, P.C., Mark G. Grueskin, Byeongsook Seo, Kara Veitch, Denver, Colorado, for Plaintiffs–Appellees.

John W. Suthers, Attorney General, Jason R. Dunn, Deputy Attorney General, Denver, Colorado, for Defendant–Appellant.

Jonathan M. Anderson, Monica S. Aldridge, Denver, Colorado, for Amicus Curiae Bill Owens, Colorado Governor.

Kelly, Haglund, Garnsey & Kahn, LLC, David R. Fine, Denver, Colorado, for Amicus Curiae Colorado Common Cause.

Opinion by Judge ROTHENBERG.

Defendant, Ginette Dennis, appeals an order of the Denver District Court granting a preliminary injunction enjoining the implementation of an administrative rule that she recently adopted in her official capacity as the Colorado Secretary of State. Rule 1.14(b), if implemented, would force labor and other covered organizations to get written permission before using an individual's dues or contributions to fund political campaigns. At issue in this appeal is whether the district court applied an incorrect legal standard and abused its discretion in determining that plaintiffs, who are described in detail below, had shown a reasonable probability (1) that the Secretary of State exceeded her rulemaking authority in enacting Rule 1.14(b); (2) that Rule 1.14(b), as applied in this case, violates the First and Fourteenth Amendment rights of association of plaintiffs, and (3) that plaintiffs were entitled to a preliminary injunction prohibiting the Secretary of State from enforcing the new rule until further order of the court. Because we conclude the district court correctly applied the law and did not abuse its discretion, we affirm the order and remand for further proceedings.

## I. Background

Most of the salient facts are undisputed. In 2002, Colorado voters passed the Campaign and Political Finance Amendment, Colo. Const. art. XXVIII, an initiative regulating campaign financing. The measure was intended to regulate political speech designed to influence the outcome of state elections. *Harwood v. Senate Majority Fund, LLC*, 141 P.3d 962 (Colo.App.2006).

Under Article XXVIII, a "membership organization" such as a labor union is permitted to establish a "small donor committee" for the purpose of pooling member dues and contributions and making political contributions. A "small donor committee" is defined as a committee that accepts contributions only from natural persons, each of whom contributes no more than $50 per year. Article XXVIII, § 2(14)(a). Corporations and labor organizations are otherwise prohibited

from financing a candidate's election. Article XXVIII, § 3(4)(a).

The term "member" is not defined in Article XXVIII. The Fair Campaign Practices Act (FPCA), § 1–45–101, et seq., C.R.S.2006, also does not define "member," but provides that "small donor committee" shall have the same meaning as set forth in Article XXVIII, § 2(14). Section 1–45–103(16), C.R.S.2006.

Article XXVIII excludes from the definition of "contribution" the transfer of "member" dues from a membership organization to a small donor committee sponsored by such membership organization. Article XXVIII, § 2(5)(b). Thus, as long as a membership organization collects funds only from natural persons at a rate of no more than $50 per year, it is permitted to transfer unlimited amounts to its small donor committee. The small donor committee, in turn, can contribute to candidates at ten times the limits that individuals must follow. Article XXVIII, § 3(2). In other words, while an individual is limited to contributing $400 per election cycle to legislative candidates and $1,000 to statewide office candidates, small donor committees can contribute $4,000 and $10,000, respectively.

Membership organizations such as labor unions often collect political contributions in small monthly increments from the dues of their members. Hence, their small donor committees are able to take advantage of the provision allowing contributions under $20 per reporting period to be anonymous. The small donor committees need not report the name, address, or occupation of these small contributors, although they must attribute such contributions to their members on a pro rata basis. *See* Article XXVIII, § 2(14)(a); § 1–45–108(1)(a)(I), C.R.S.2006.

According to the evidence presented at the preliminary injunction hearing in this case, many membership organizations that have small donor committees require that each member contribute a small portion of his or her dues to the organization's small donor committee. These contributions are often collected through automatic monthly payroll deductions by the member's employer. The plaintiff organizations in this case permit any member to request a refund if that member

disagrees with the political contributions made by these organizations.

On August 2, 2006, the Secretary adopted Rule 1.14(b), which defines "member" in the context of Article XXVIII, § 2(5)(b) as a person who pays dues to a membership organization and who gives written permission for his or her dues to be used for political purposes. Rule 1.14 now provides:

> "Member", as used in Article XXVIII, Sections 2(5)(b) and 2(14)(a) only, is a person who:
>
> (a) pays membership dues, and;
>
> (b) *at least annually gives the membership organization specific written permission to transfer dues to a political committee or small donor committee.*

Rule 1.14, 8 Code Colo. Regs. § 15056 (emphasis added).

Plaintiffs in this case are (1) two labor unions: the American Federation of Teachers, Local 858(AFT), and the Colorado Education Association (CEA); (2) their respective small donor committees: the Colorado Federation of Teachers, Health & Public Employees, and the Public Education Committee; (3) David Sanger, Walter Beckart, Vivian Stovall, Lynn Mason, and Kerrie Dallman, all of whom are residents and citizens of Colorado and associated members of at least one of these membership organizations; and (4) Michael Cerbo, a candidate for state legislature.

On August 22, 2006, plaintiffs filed this action challenging three different campaign finance rules adopted by the Secretary. Plaintiffs alleged, as relevant here, that (1) amended Rules 1.3, 1.14(b), and 4.5, which were adopted by the Secretary on August 2, were not issued in compliance with the Colorado Administrative Procedure Act (APA), § 24–4–106, C.R.C.P.S.2006; and (2) the enforcement of these rules would violate plaintiffs' First Amendment rights to freedom of speech and association, and their Fourteenth Amendment rights to due process and equal protection.

The Secretary's position is that she properly adopted these rules concerning campaign and political finance pursuant to Arti-

cle XXVIII, § 9, which confers upon her the obligation to enforce and administer the state's campaign finance laws and requires her, as relevant here, to promulgate rules "necessary to administer and enforce any provision of this article." Article XXVIII, § 9(b). The Secretary asserts that "[b]ecause of the impending election, the rules were adopted on an emergency basis to go into effect immediately."

The parties settled their dispute as to one rule, and the other two were litigated in the district court. On September 15, 2006, following a hearing, the Denver District Court denied plaintiffs' request for a preliminary injunction as to one rule not at issue here, but granted a preliminary injunction enjoining the implementation of Rule 1.14(b) until a further hearing could be held on the merits of plaintiffs' complaint.

The district court found that plaintiffs had *not* shown a reasonable probability of success on their claim that the Secretary had violated the APA in promulgating Rule 1.14(b). But the court found that plaintiffs *had shown* a reasonable probability of success on the merits as to their allegations that in promulgating the rule, the Secretary had acted in excess of her rulemaking authority and that the application of Rule 1.14(b) violated plaintiffs' First and Fourteenth Amendment associational rights.

The court found that (1) Rule 1.14(b), if implemented, would force organizations to get written permission before using individuals' dues to fund political campaigns; (2) it would "probably take two to three months, at a cost of up to four dollars per member" to comply with Rule 1.14(b); and (3) "the time frame of its enactment and the fact that it's effective immediately denies the members of the membership organization ... the constitutional right to associate [with respect to the November 2006 election]."

The district court also determined that the Secretary's newly enacted definition of "member" conflicted with the commonly understood dictionary definition of "member," reasoning that, "[w]hen a statute [or] constitutional provision does not define the term, the Court should apply the commonly understood dictionary meaning."

After finding that plaintiffs had satisfied all the requirements for a preliminary injunction set forth in *Rathke v. MacFarlane*, 648 P.2d 648 (Colo.1982), the district court granted a preliminary injunction staying the enforcement of Rule 1.14(b). The court also granted the Secretary's motion to stay the decision until September 19, 2006, at midnight.

On September 18, 2006, the Secretary filed a notice of appeal from the district court's order and an emergency motion for continuance of the stay, asserting that if a stay were not granted, the appeal would be moot. Also on September 18, Governor Bill Owens filed a motion for leave to file an amicus curiae brief, which we granted. The Governor urged this court to continue the stay issued by the Denver District Court.

■ A preliminary injunction is considered to be a final order and is appealable under C.A.R. 1(a)(3). *See Zoning Bd. of Adjustment v. DeVilbiss*, 729 P.2d 353 (Colo.1986); *Black Hawk–Central City Ace Express, Inc. v. Entrup*, 983 P.2d 9 (Colo.App.1998). Thus, we have jurisdiction over this case. Because the parties have asserted that the issues raised in this appeal relate to campaign finance matters that could affect the general election scheduled for November 7, 2006, we granted the Secretary's motion for continuance of the stay until further order of this court. We also expedited the appeal and the filing of briefs and set oral argument in this case before a division of this court on September 26, 2006.

## II. Standard of Appellate Review

■ Preliminary injunctive relief is designed to protect a plaintiff from sustaining irreparable injury and to preserve the trial court's ability to render a meaningful decision following a trial on the merits. The power to grant a preliminary injunction "should be exercised sparingly and cautiously and with a full conviction on the part of the trial court of its urgent necessity." *Rathke v. MacFarlane, supra*, 648 P.2d at 653; *see Tesmer v. Colo. High Sch. Activities Ass'n*, 140 P.3d 249 (Colo.App.2006).

A trial court's decision on a motion for a preliminary injunction is reviewed for an abuse of discretion and will be overturned only for an error in law or a manifestly arbitrary, unreasonable, or unfair decision. *Cornerstone Group XXII, L.L.C. v. Wheat Ridge Urban Renewal Auth.,* 151 P.3d 601, 2006 WL 2291146 (Colo.App. No. 05CA0279, Aug. 10, 2006); *Bloom v. Nat'l Collegiate Athletic Ass'n,* 93 P.3d 621 (Colo.App.2004).

A preliminary injunction is not warranted unless the trial court finds that the moving party has demonstrated the following: (1) the moving party has a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury exists that may be prevented by injunctive relief; (3) the moving party has no plain, speedy, and adequate remedy at law; (4) the granting of a preliminary injunction will not disserve the public interest; (5) the balance of equities favors granting the injunction; and (6) the injunction will preserve the status quo pending a trial on the merits. *Rathke v. MacFarlane, supra.*

Where the issue on appeal concerns only legal as opposed to factual questions, the trial court's judgment is subject to independent review. *Evans v. Romer,* 854 P.2d 1270, 1274 (Colo.1993); *see Lafferty v. Cook,* 949 F.2d 1546, 1550 (10th Cir.1991) (constitutionally mandated standard is a question of law to be reviewed de novo). Where there is a mixed question of law and fact, the reviewing court will give deference to the trial court's factual findings, absent an abuse of discretion. *People v. Taylor,* 131 P.3d 1158 (Colo.App.2005).

III. The Secretary's Arguments on Appeal

The Secretary of State contends that the district court failed to adhere to the rule that administrative regulations regularly promulgated are presumed valid and that the burden is upon the challenging party to establish the asserted invalidity beyond a reasonable doubt, as provided by *Augustin v. Barnes,* 626 P.2d 625 (Colo.1981); *Evans v. Romer, supra,* and other cases. According to the Secretary, when the proper standard of review is applied, at least four of the requirements of *Rathke v. MacFarlane, supra,* are

not satisfied this case, and therefore, the district court erred in granting a preliminary injunction. The Secretary also challenges the district court's findings that (1) there is a reasonable probability she acted in excess of her rulemaking authority by promulgating a definition of "member" that is inconsistent with Article XXVIII; and (2) there is a reasonable probability that Rule 1.14(b) violates the plaintiffs' First and Fourteenth Amendment associational rights. We are not persuaded.

### A. District Court Applied Correct Burden of Proof

Initially, we address the Secretary of State's contention that the district court failed to apply the proper legal standard because it did not require the plaintiffs to prove the new rule is unconstitutional beyond a reasonable doubt. We disagree.

Here, unlike in *Augustin v. Barnes, Evans v. Romer,* and similar cases, the district court did not declare any of the Secretary's new rules facially unconstitutional. We read the district court's order only as finding that plaintiffs had demonstrated a reasonable probability that the Secretary exceeded her authority by enacting Rule 1.14(b), and that the rule, *as applied in this case,* would violate plaintiffs' First and Fourteenth Amendment rights. The district court reached this determination after finding the new rule would prevent plaintiffs from exercising their First Amendment rights during this election cycle.

There is an important difference between a facial challenge to the constitutionality of a statute or rule and an "as applied" challenge:

A plaintiff bringing an "as-applied" challenge contends that the statute would be unconstitutional under the circumstances in which the plaintiff has acted or proposes to act. If a statute is held unconstitutional "as applied," the statute may not be applied in the future in a similar context, but the statute is not rendered completely inoperative.

In contrast, a "facial" constitutional challenge outside the First Amendment free-speech context is used when a plaintiff seeks to render a statute utterly inoperative. Facial challenges must be rejected "unless there exists *no set of circumstances* in which the statute can constitutionally be applied."

*Olmer v. City of Lincoln*, 23 F.Supp.2d 1091 (D.Neb.1998). 23 F.Supp.2d at 1104 (citations omitted; quoting *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011, 1012, 113 S.Ct. 633, 633–34, 121 L.Ed.2d 564 (1992)(Scalia, J., dissenting) ).

■■■ "The practical effect of holding a statute unconstitutional as applied is to prevent its future application in a similar context, but not to render it utterly inoperative. To achieve the latter result, the plaintiff must succeed in challenging the statute on its face." *Ada v. Guam Soc'y of Obstetricians & Gynecologists, supra*, 506 U.S. at 1012, 113 S.Ct. at 633. A facial challenge to a statute or rule cannot succeed unless the party challenging it has established the asserted invalidity beyond a reasonable doubt. *Evans v. Romer, supra; Augustin v. Barnes, supra.* However, the same is not true of an "as applied" challenge.

In any event, here, the district court was fully aware of the *Rathke* standards and referred to them in its ruling. Moreover, the parties had made the court aware of the "beyond a reasonable doubt" standard and there is no indication from the court's ruling that it was applying a different evidentiary burden. Accordingly, we reject this contention.

### B. Plaintiffs Did Not Receive Complete Relief

■■■ Relying on *Allen v. City and County of Denver*, 142 Colo. 487, 489, 351 P.2d 390, 391 (1960), the Secretary argues next that the injunction "would grant [p]laintiffs all the relief they could receive in a full trial, [and therefore] they must establish that their "right to the relief is *clear and certain*." We conclude the Secretary's reliance on *Allen* is misplaced.

In *Allen,* an action was filed against the City and County of Denver and an engineering company for injunctive relief and damages involving water accumulation and run-off in streets and gutters in a part of southwest Denver. The trial court denied the preliminary injunction, and the supreme court upheld that ruling, noting that if the relief sought had been granted, it would have required the reconstruction of streets, gutters and culverts and possibly the installation of a storm sewer by the city, which the court described as "an undertaking of great magnitude." The court stated: "[I]f a preliminary mandatory injunction will have the effect of granting to the complainant all the relief that he could obtain upon a final hearing, it should not be issued." *Allen v. City & County of Denver, supra,* 142 Colo. at 489, 351 P.2d at 391.

Here, the district court clarified that it was enjoining the enforcement of Rule 1.14(b) *as applied* to these plaintiffs. *See Olmer v. City of Lincoln, 23 F.Supp.2d 1091 (D.Neb.1998).* Because of the short time frame before the November 2006 election and the fact that plaintiffs could not reasonably comply with the amended rule in time meaningfully to participate in that election, the court sought to maintain the status quo by permitting the parties to proceed in accordance with the practices authorized by the plain language of Article XXVIII. The parties will have a full opportunity at the trial on the merits to determine the final relief, if any, to which plaintiffs are entitled.

### C. Reasonable Probability that the Secretary Exceeded Her Rulemaking Authority

■■■ The Secretary next contends the district court erred in determining there was a reasonable probability that she had exceeded her rulemaking authority in enacting Rule 1.14(b). We disagree.

In *Harwood v. Senate Majority Fund, LLC, supra,* a division of this court construed the term, "electioneering communication," contained in Article XXVIII. The division concluded that because the term was not specifically defined in Article XXVIII or by case law, resort to the dictionary was neces-

sary. The *Harwood* division stated the general principle: "In construing a constitutional provision, our obligation is to give effect to the intent of the electorate that adopted it. In giving effect to that intent, we look to the words used, reading them in context and according them their plain and ordinary meaning." *Harwood v. Senate Majority Fund, LLC, supra,* 141 P.3d at 964; *see Bruce v. City of Colorado Springs,* 131 P.3d 1187 (Colo.App.2005).

Similarly, here, the district court concluded that because the term "member" was not defined by Article XXVIII and was a commonly used term, the court should apply the plain and ordinary meaning of the word. The district court also found the Secretary's definition was inconsistent with the language of Article XXVIII because nothing in the Article requires members of a union to give annual written permission before their dues may be transferred.

The district court reasoned as follows:

Rule 1.14(b), although it is presented in the form of a definition, *it really isn't a definition. What it does in substance is it imposes a restriction on the ability of the member organizations to contribute through small donor committees by requiring this specific written permission.* And based upon my findings above, I would find that with regard to the difficulty and expense of getting specific written permission that that is a substantial restriction or limitation. It's one that is not found in Article XXVIII otherwise and cannot be reasonably inferred from Article XXVIII and, in fact, that provision of Article XXVIII providing for treatment as pro rata contributions suggest that its—Article XXVIII was intended to facilitate this type of small contribution being grouped and ... transferred to small donor committees.

(Emphasis added.)

We agree with the trial court that the new rule imposes a restriction that is not supported by the text of Article XXVIII.

The Secretary relies on *Tivolino Teller House, Inc. v. Fagan,* 926 P.2d 1208, 1211 (Colo.1996), for the proposition that her interpretation and definition of the term "member" should be given deference. In *Tivolino,* the supreme court upheld the validity of the Limited Gaming Commission's regulation that defined the term "payment to players." The court concluded that the term was ambiguous, that "the Commission's interpretation of the term ... does not redefine an otherwise defined term and that the Commission promulgated [the regulation] pursuant to its delegated constitutional and statutory authority." *Tivolino, supra,* 926 P.2d at 1213.

In reaching its conclusion, the court in *Tivolino* distinguished two earlier decisions that had rejected an agency's interpretation, concluding those interpretations were contrary to the plain terms of the statutes at issue. *See Boulder County Bd. of Equalization v. M.D.C. Const. Co.,* 830 P.2d 975 (Colo. 1992); *Golden Aluminum Co. v. Weld County Bd. of County Com'rs,* 867 P.2d 190 (Colo. App.1993).

The court in *Tivolino* stated: "We are confronted here with the language of a constitutional amendment, rather than a legislative statute, with terms which are ambiguous and subject to more than one reasonable interpretation [and we find that] the Commission's definition is a reasonable interpretation of the constitutional language, and consistent with its purposes." *Tivolino, supra,* 926 P.2d at 1216.

In this case, as in *Tivolino,* we are confronted with the language of a constitutional amendment, and although the term "member" is commonly used, it has been given a number of meanings. *See Fed. Election Comm'n v. Nat'l Right to Work Committee,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (construing the term "member"); *Chamber of Commerce v. Federal Election Comm'n,* 69 F.3d 600, 604 (D.C.Cir. 1995)("We do not agree that 'members' has a plain meaning."). We thus conclude the term is ambiguous.

Nevertheless, plaintiffs here presented evidence that the Secretary's definition is neither a reasonable interpretation nor consistent with the purposes of Article XXVIII. This evidence includes the Ballot Information Book ("Blue Book") from the Legislative Council of the Colorado General Assembly

(Council), which publishes analyses of ballot proposals to provide information to the voters. Although the Council's interpretation of a proposed amendment is not binding, the supreme court has said that these analyses provide "important insight into the electorate's understanding of the amendment when it was passed" and are "helpful in the construction of constitutional amendments." *Tivolino, supra,* 926 P.2d at 1214.

The 2002 Ballot Information Booklet explained to voters that Article XXVIII would create small donor committees and would encourage fundraising "from a broad base of individual donors." The Booklet also included a chart that clarified the allowable contributions by small donor committees and by unions.

We emphasize that we do not interpret the district court's order as invalidating Rule 1.14(b). After reading the court's findings, we conclude it simply found that plaintiffs had shown a reasonable probability of success on their claim that the Secretary's definition of "member" in Rule 1.14(b) was an unreasonable interpretation of the language in Article XXVIII, was inconsistent with its purposes, and was not in accord with the intent of those who adopted it. *See Tivolino, supra; Boulder County Bd. of Equalization v. M.D.C. Const. Co., supra; Golden Aluminum Co. v. Weld County Bd. of County Com'rs, supra.*

We note that the Secretary's definition of "member" also bears little resemblance to the federal definition. *See* 11 C.F.R. § 114.1(e)(2) (2006) (defining "members" for purposes of the Federal Election Campaign Act as "all persons who are currently satisfying the requirements for membership in a membership organization, affirmatively accept the membership organization's invitation to become a member, and either: (i)[h]ave some significant financial attachment to the membership organization, such as a significant investment or ownership stake; or (ii)[p]ay membership dues at least annually, of a specific amount predetermined by the organization; or (iii)[h]ave a significant organizational attachment to the membership organization which includes: affirmation of membership on at least an annual basis; and

direct participatory rights in the governance of the organization").

Here, the district court's determination of a reasonable likelihood of success on the merits is well supported.

First, the Secretary's "definition" is much more than an effort to define the term. It can be read to effectively add, to modify, and to conflict with the constitutional provision by imposing a new condition; that is, the necessity to obtain the affirmative written permission of members to transfer dues to a political or small donor committee. That condition is found nowhere in Article XXVIII.

Second, the Secretary's stated purpose in enacting the rule—because small donor committees exercise a disproportionate level of influence over the political process—is not furthered by the "definition" because Article XXVIII specifically authorizes the pooling of resources in this way.

Third, the rule does not further the Secretary's stated goal of achieving a transparency of contributions because Article XXVIII only requires the names of contributors to be disclosed when their pro rata contribution exceeds $20.

In addition, the timing and scope of the Secretary's definition raise significant constitutional issues, as discussed later in this opinion. *See AFL and CIO v. Federal Election Comm'n,* 333 F.3d 168, 175 (D.C.Cir. 2003)("[W]e do not accord the [Election] Commission deference when its regulations create 'serious constitutional difficulties.' ' (quoting *Chamber of Commerce v. Federal Election Comm'n, supra,* 69 F.3d at 604–05).

Thus, while we disagree with the district court that "member" must necessarily be given its dictionary meaning, we nevertheless conclude plaintiffs have demonstrated a reasonable probability of success in challenging the Secretary's authority to enact this rule.

### D. Reasonable Probability that Rule 1.14(b) Violates Plaintiffs' Right to Freedom of Association

The First and Fourteenth Amendments to the United States Constitution pro-

tect the freedom of an individual to associate for the purpose of advancing beliefs and ideas. *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 233, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Elrod v. Burns,* 427 U.S. 347, 355–57, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *State ex rel. Washington State Public Disclosure Comm'n v. Wash. Educ. Ass'n,* 156 Wash.2d 543, 557, 130 P.3d 352, 357–58 (2006) (cert. granted Sept. 26, 2006).

The practice of persons banding together to make their political voices heard is deeply embedded in the American political process. *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981)("Its value is that by collective effort individuals can make their views known, when, individually, their voices would be faint or lost.").

 The freedom to associate encompasses the freedom to contribute financially to an organization for the purpose of spreading a political message. *Citizens Against Rent Control v. City of Berkeley, supra,* 454 U.S. at 296, 102 S.Ct. at 437. "Making a contribution" "enables like-minded persons to pool their resources in furtherance of common political goals," and restrictions on expenditures in political campaigning "implicate fundamental First Amendment interests." *Buckley v. Valeo,* 424 U.S. 1, 14, 22–23, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976). When a state election-related statute implicates First Amendment rights, the analysis "turn[s] in large measure on whether the regulation at issue is subject to a balancing test or strict scrutiny." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson,* 236 F.3d 1174, 1196 (10th Cir. 2000) (quoting *Campbell v. Buckley,* 203 F.3d 738, 742 (10th Cir.2000).

 The freedom of association includes the converse right not to be compelled to support political and ideological causes with which one disagrees, *Hurley v. Irish–American Gay, Lesbian, & Bisexual Group,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), and the freedom not to speak or to have one's money used to advocate ideas one opposes. *Keller v. State Bar of Calif.,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). "[A]t the heart of the First Amendment is

the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood, supra,* 431 U.S. at 234–35, 97 S.Ct. at 1799.

In *Abood, supra,* the United States Supreme Court concluded that the union was allowed to use members' dues for purposes other than collective bargaining, provided the money did not come from employees who objected to the causes supported. The Court stated: "[T]he Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Abood, supra,* 431 U.S. at 235–36, 97 S.Ct. at 1800.

 Thus, the Supreme Court has made it clear that compulsory union dues may not be used to support political causes if the member disagrees with those causes, but "dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee." *International Ass'n of Machinists v. Street,* 367 U.S. 740, 773–74, 81 S.Ct. 1784, 1802–03, 6 L.Ed.2d 1141 (1961) ("[T]he majority also has an interest in stating its views without being silenced by the dissenters"). The burden is on the employee to make his or her objection known. *Abood, supra; Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

Here, however, the Secretary's rule presumes dissent by requiring an affirmative statement each year, which is inconsistent with the case law we have cited.

 Where the regulation restricts the "overall quantum of speech" available to the election process, a strict scrutiny review applies. *Citizens for Responsible State Political Action Committee, supra; Campbell v. Buckley, supra,* 203 F.3d 738, 744–45 (strict scrutiny applies where the quantum of speech is limited due to restrictions on cam-

paign expenditures, the available pool of circulators or other supporters of a candidate or initiative, or the anonymity of such supporters).

██ Strict scrutiny review is the most exacting standard of review for First Amendment challenges. It requires a showing that the law in question is supported by a compelling governmental interest and is narrowly drawn to achieve that interest by the least restrictive means possible. *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); *Campbell, supra; see Clingman v. Beaver*, 544 U.S. 581, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005).

██ As the court explained in *Campbell, supra*,

> The cases discussed above which applied strict scrutiny do not lend themselves to a simple synthesis. As we read them, however, strict scrutiny is applied where the government restricts the overall quantum of speech available to the election or voting process. More particularly, strict scrutiny is employed where the quantum of speech is limited due to restrictions on campaign expenditures, as in [*Buckley v.] Valeo, [supra* ] .... In *Valeo*, [424 U.S. at 18, 39, 96 S.Ct. at 634, 644], the Court applied exacting scrutiny to contribution and expenditure limits, reasoning that "contribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties," and that "a primary effect of ... expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates."

*Campbell, supra*, 203 F.3d at 745 (footnote omitted).

In *State ex rel. Washington State Public Disclosure Commission v. Washington, Education Ass'n, supra*, 156 Wash.2d 543, 558, 130 P.3d 352, 358 (2006), the Supreme Court of Washington, applying a strict scrutiny review, declared unconstitutional a statute that, like the Secretary's definition here, imposed an "opt in" procedure. This procedure required that nonmembers of a union affirma-

tively authorize the union's use of their agency shop fees for political purposes.

██ However, we do not agree that strict scrutiny is the proper standard of review. In *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), the United States Supreme Court distinguished restrictions on campaign expenditures from restrictions on campaign contributions and stated: "In *Buckley [v. Valeo, supra* ] and subsequent cases, we have subjected restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions.... [W]e have recognized that contribution limits, unlike limits on expenditures, "entai[l] only a marginal restriction upon the contributor's ability to engage in free communication." (quoting *Buckley, supra*, 424 U.S. at 20, 96 S.Ct. 612). The Court added: "[W]e have consistently applied less rigorous scrutiny to contribution restrictions aimed at the prevention of corruption and the appearance of corruption." *McConnell, supra*, 540 U.S. at 138 n. 40, 124 S.Ct. at 657 n. 40.

Here, the district court applied strict scrutiny and found that (1) Rule 1.14(b) prohibits membership organizations from making expenditures in support of political purposes unless they have specific written permission from each member; (2) the rule's new requirement that an organization get written permission before counting an individual as a "member" and using that person's money for political purposes, burdens expressive activity; (3) the rule restricts the quantum of speech available to the election process because it has the effect of severely limiting campaign expenditures available for the upcoming November 2006 election; and therefore (4) the new rule would deny members and membership organizations the right to participate in the political process provided to them under Article XXVIII of the Colorado Constitution and the First Amendment right of association.

The district court's relevant findings are as follows:

> The AFT has 5200 members, approximately, the CEA has about 37,000 members; most of these are teachers and public employees. Members are spread all over the

state. Members as part of their membership pay dues, a certain percentage of those dues is allocated for political purposes. The members do not direct or really have any say in how the money is spent for political purposes. Members can request a refund after the election cycle [if they disagree with the manner in which the dues are spent for political purposes]. I would find that getting specific written permission from all or most of the members of both of these organizations would be expensive. A certain percentage could be reached by e-mail, but the two unions involved have reluctance to use e-mails at the schools or workplaces of the member because it is for political purposes and could be subject to criticism.

. . . .

I would find that most of the contact with regard to obtaining specific written permission would have to be done by regular mail . . . .

I would find that historically these membership organizations do not have high response rates from regular mail [and] because of this low response rate it would be necessary to have some personal contact or followup calls. All of this . . . would be expensive.

. . . .

I would also find that the effort would be substantially time-consuming. I think the testimony of three to six months . . . is exaggerated, but I think the evidence supports a finding that it would take a minimum of one month, more probably two to three months to get a high percentage return rate on specific written permission from members.

I would also find that by reasonable inference . . . it is probable that the unions would get a high favorable response rate giving specific written permission. I think that that inference is warranted from the fact that these persons are members of the union and thus have that affiliation or loyalty generally, with exceptions, obviously, and also the unions have a refund option, which although not well publicized by the unions, still it is very rare that people exercise that option. So based upon all

those findings, I would find that should the time and expense undertaken to obtain specific written permission that there would be a high return rate.

Because of the date of adoption of Rule 1.14(b) and the proximity of the 2006 election, I would find that Rule 1.14(b) would substantially impair the members' ability to have their dues used for political purposes for the 2006 election.

. . . .

I would find it's more probable than not that by the time the written specific permission was obtained it would be too late to really have any—to be able to use those member dues effectively for the 2006 election.

Based upon these findings, I conclude that [Rule] 1.14(b) . . . as applied—by as applied, I mean the time frame of its enactment and the fact that it's effective immediately denies the members of the membership organizations . . . the constitutional right to associate, that is to essentially pool their small contributions through the small donor committee such that the large contribution would be— more likely to have some influence, whereas, the small contributions would not.

Because this case concerns restrictions on contributions by union members, and not expenditures, we conclude strict scrutiny is not required and a less rigorous scrutiny is appropriate. Nevertheless, even applying an intermediate review to the district court's findings of fact, we conclude plaintiffs have shown a reasonable probability of success on their First Amendment freedom of association claim.

First, Rule 1.14(b) imposes upon unions and their members an "opt in" requirement that is inconsistent with the numerous decisions that presume union members assent to the decisions of their leadership, and require that members "opt out" if they wish to receive a refund of that portion of their dues used for political purposes. *Abood, supra; Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, supra; Chicago Teachers Union v.*

*Hudson, supra; International Ass'n of Machinists v. Street, supra.*

Second, by employing an "opt out" procedure, the plaintiff-unions in this case complied with federal and state constitutional requirements. Yet Rule 1.14(b) effectively denies the First Amendment rights of the majority of union members for the benefit of dissenting members, in contravention of *Abood, supra,* and other cases. Therefore, we conclude the trial court did not err in finding that the plaintiffs have shown a reasonable probability of success on their First Amendment claim.

We find further support for the district court's ruling in *Michigan State AFL–CIO v. Miller,* 103 F.3d 1240, 1253 (6th Cir.1997). There, the secretary of state challenged an order by the district court preliminarily enjoining the enforcement of a section of the Michigan Campaign Finance Act, which required labor unions to obtain affirmative consent at least once per year from those members utilizing an automatic payroll deduction to make contributions to their union for political purposes.

The district court applied strict scrutiny and concluded the above-mentioned section of the statute requiring affirmative consent violated the plaintiffs' speech and association rights under the First and Fourteenth Amendments, and it issued the preliminary injunction. The Sixth Circuit Court of Appeals reversed, concluding that the annual consent requirement was content neutral, and that intermediate scrutiny was the appropriate standard of review. *Mich. State AFL–CIO v. Miller, supra,* 103 F.3d at 1252.

The appeals court then reviewed the issue independently "to determine the likelihood of success on the merits under the appropriate constitutional standard," *Mich. State AFL–CIO v. Miller,* supra, 103 F.3d at 1253, and applied the three-pronged test articulated in *Turner Broadcasting System, Inc. v. Federal Communications Commission,* 512 U.S. 622, 662, 114 S.Ct. 2445, 2469, 129 L.Ed.2d 497 (1994), used to determine whether a content-neutral law will satisfy intermediate scrutiny.

The first prong requires that the statute "furthers an important or substantial governmental interest." *Mich. State AFL–CIO v. Miller, supra,* 103 F.3d at 1253 (quoting *Turner, supra,* 512 U.S. at 662, 114 S.Ct. at 2469). The appeals court concluded the first prong was satisfied because "the right not to contribute to political causes that they do not favor is as central a First Amendment right as is the right to solicit funds." *Mich. State AFL–CIO v. Miller, supra,* 103 F.3d at 1253.

The second prong requires that "the governmental interest is unrelated to the suppression of free speech." *Mich. State AFL–CIO v. Miller, supra,* 103 F.3d at 1253 (quoting *Turner, supra,* 512 U.S. at 662, 114 S.Ct. at 2469). The appeals court also concluded the second prong was met: "The governmental interest at stake here is striking a balance between the right to solicit political contributions and the co-equal right not to contribute, an interest wholly unrelated to the suppression of free speech." *Mich. State AFL–CIO v. Miller, supra,* 103 F.3d at 1253.

The third prong requires that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner, supra,* 512 U.S. at 662, 114 S.Ct. at 2469 (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)). "Narrow tailoring in this context requires ... that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner, supra,* 512 U.S. at 662, 114 S.Ct. at 2469 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989).

The appeals court concluded the third prong had also been met:

> While plaintiffs ... suggest that the administrative burden of the annual consent provision will be crushing, *they offer no support for that claim.* An annual mailing to a union's contributing members, asking them to check a box and to return the notice to the union, would seem to suffice under the statute. Labor unions surely maintain some sort of records on their members already, and requiring the unions to make space in their files or databases for the inclusion of one more piece of information seems minimal, certainly a

burden insufficient to rise to the level of a constitutional violation.

*Mich. State AFL–CIO v. Miller, supra,* 103 F.3d at 1253 (emphasis added).

Here, however, plaintiffs offered considerable evidence at the hearing, which the district court accepted, that the Secretary's immediate enforcement of the rule would have effectively prevented plaintiffs from exercising their First Amendment rights in the November 2006 election. Furthermore, the rule was not narrowly tailored because it would have created a complete barrier preventing union members, who wanted their dues and contributions used to support political candidates during the 2006 campaign, from doing so. And, we conclude that the rationale justifying this infringement on the plaintiffs' First Amendment rights was based upon speculation that there would be dissenters. Thus, we conclude plaintiffs here have demonstrated a reasonable probability that Rule 1.14(b) impermissibly penalizes the constitutional rights of the many for the speculative rights of the few.

By employing an "opt out" procedure permitting members to obtain refunds of that portion of their dues used for undesired political contributions, the plaintiff-unions in this case complied with federal and state constitutional requirements. By doing so, the presumption is created that all or almost all of the union members have consented to the disbursement of their funds. Yet, as applied under the circumstances of this case, Rule 1.14(b) effectively reverses this presumption in contravention of *Abood* and its progeny, thus denying the First Amendment rights of a majority of union members for the benefit of a minority of putative dissenting members.

Accordingly, even if we assume the requirements of the first two prongs were met in this case, we conclude the third prong of the *Turner* test was not satisfied because the district court found, based on the evidence presented, that the written consent requirement of Rule 1.14(b) could not reasonably be accomplished for two to three months. It was not simply a matter of asking the members "to check a box once a year," as in *Mich. State AFL–CIO v. Miller, supra.*

The district court's findings that the majority of union members support the political decisions made by their leadership are in accord with observations made by the Supreme Court in *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). The Court in *Austin* recognized there were crucial differences between a union and a corporation, because an unincorporated union amasses its treasury without the help of the state-conferred advantage that a corporate structure bestows. The Court also noted that funds available to a union for political expression more accurately reflect member support because of the refund procedures available to members who object to a union's political activities. *Austin, supra,* 494 U.S. at 665, 110 S.Ct. at 1400.

Other courts have observed that there is "an accurate correspondence between members' support and the amount of funds devoted to political expression [because of] the democratic structure of unions; the union officials who make the spending decisions have been elected to their position by union." *United Auto Workers, Local Union 1112 v. Philomena,* 121 Ohio App.3d 760, 786, 700 N.E.2d 936, 953 (1998)("[U]nion funds available for political expression reflect the collective sentiment of the individual members."); *see Fed. Election Comm'n v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 258, 107 S.Ct. 616, 628–29, 93 L.Ed.2d 539 (1986) ("The resources in the treasury of a business corporation ... are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers.")

Therefore, even applying an intermediate level of scrutiny, *see McConnell v. Fed. Election Comm'n, supra,* we conclude the record supports the district court's determination that plaintiffs have shown a reasonable probability of success on the merits of their claim that Rule 1.14(b), *as applied to these plaintiffs,* would violate their associational rights under the First and Fourteenth Amendments.

Finally, we reject the Secretary's argument that Rule 1.14(b) had to be enacted on an emergency basis to protect union members who did not agree with the political

decisions made by their member organizations. The district court expressly found it was probable that the unions would get a high favorable response rate from its members, that they would give the unions their specific written permission, and that the refund option available to members was rarely exercised. These findings by the court repudiate the Secretary's assertions that an emergency existed.

In conclusion, we perceive no error by the district court in determining that plaintiffs demonstrated a reasonable probability of success as to their claim that Rule 1.14(b), as applied to them, infringes upon their First Amendment associational rights.

### E. Other Requirements of Rathke

█ The Secretary also contends the district court abused its discretion in finding that the injunction serves the public interest, that the equities favor the granting of the injunction, and that the injunction will preserve the status quo pending a trial on the merits. We disagree.

The district court found that "member organizations and members would suffer real immediate and irreparable harm if an injunction were not entered" because "given the timing and my other findings, [the rule] substantially impairs the right of those organizations and their members to participate in the 2006 election, and once that right is lost, it's not recoverable." The court further found that "the public is not disserved by enjoining the enforcement of 1.14(b) because an injunction essentially preserves the rights of members and member organizations to participate in the political process as given to them in Article XXVIII." Last, the court found "[T]he appropriate status quo in a situation like this is the status quo ante, that is the status quo before the rule was enacted. And this, an injunction, would maintain the status quo ante."

We conclude the record supports the district court's findings on these matters, and consequently, the court did not abuse its discretion by entering a preliminary injunction against the Secretary.

Given our conclusions, we do not address the other issues raised by the parties.

The order is affirmed, and the case is remanded to the district court for further proceedings. The stay of execution granted by this court is dissolved, effective Monday, October 2, 2006 at 4:00 p.m. Any further request for a stay shall be filed in the Colorado Supreme Court.

Judge CASEBOLT and Judge BERNARD concur.